**Opinion issued October 3, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-12-00134-CV
_____

**JAVIER A. VEGA, Appellant**

**V.**

**FULCRUM ENERGY, LLC AND FULCRUM POWER SERVICES, L.P.,**
**Appellees**

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-67819**

## O P I N I O N

In this partnership dispute, the parties agreed that a termination of Javier

Vega's employment by Fulcrum Energy, LLC without cause would give Vega the

option to force Fulcrum Power Services, L.P. to repurchase Vega's partnership

interest in Fulcrum Power. In that event, they also agreed on how Vega's partnership interest would be valued—specifically, they agreed in Section 21 of the Partnership Agreement that "[i]n determining the valuation of . . . the Partnership Interest . . . , no value shall be placed on the goodwill or name of the Partnership[.]" A jury found that Vega was terminated without cause, and, based on the testimony of Vega's expert, assessed the value of Vega's partnership interest at $1.98 million.

Fulcrum Energy and Fulcrum Power (collectively, "Fulcrum") moved to disregard the jury's answer to the damages question and for JNOV on the basis that Vega's expert's opinion that his damage figure included no value for goodwill, as required by Section 21, was unreliable and amounted to no evidence. The trial court granted the motion and entered judgment 1) awarding Vega damages for breach of his Employment Agreement in the amount of $129,863.02, which was an amount stipulated by the parties, plus prejudgment interest and 2) awarding Fulcrum attorney's fees in the amount of $757,746.93, plus conditional appellate fees, costs, and postjudgment interest.

On appeal, Vega challenges the JNOV and the fee award. We reverse and remand.

**Background**

**A. Vega's Employment, Partnership, and Termination**

In early 2007, Fulcrum Power bought Vega Resources, LLC d/b/a Amigo Energy, a retail energy provider. Vega held membership interests in Amigo at the time, and, as part of the transaction, he exchanged his interest in Amigo for 266,666 partnership units in Fulcrum Power. Vega also entered into an Employment Agreement with Fulcrum Power, through Fulcrum Energy, LLC, the general partner of Fulcrum Power.

On October 3, 2008, Fulcrum Energy terminated Vega's employment. The termination letter stated that Vega's termination was for cause under Sections 8(c)(ii) and 8(c)(ix) of the Employment Agreement. Those sections defined cause, respectively, as: "conduct of [Vega], even if not in connection with the performance of his duties hereunder, which is materially detrimental (monetarily or otherwise) to the interests or reputation of the Company" or "a material breach by [Vega] of this Agreement."

Another agreement, the Joinder Agreement, gave Vega the option to sell his partnership interest back to the partnership in the event he was terminated *without* cause. Section 3(b) provided:

> *Termination Without Cause or for Good Reason after Change of Control of the Partnership.* In the event that the employment of

3

Employee with the Partnership is terminated without Cause by the Partnership pursuant to Section 8(b) of the Employment Agreement . . . the Employee . . . shall have the option, but not the obligation, to sell and, should the Employee so elect, Partnership shall be required to purchase, all of Employee's Units for the price and on the terms set forth in this clause(b). The purchase price for the Units of Employee shall be valued pursuant to Section 21 of the Partnership Agreement as of the date of the termination of Employee's employment.

Section 21(c) of the Partnership Agreement prescribes the manner in which the partnership interest would be valued in this event. Of importance here is the fact that Section 21 requires that in determining value in this context, "no value shall be placed on the goodwill or name of the Partnership." It states, in relevant part:

In determining the valuation of . . . the Partnership Interest of any Partner in the Partnership or in any accounting among the Partners, no value shall be placed on the goodwill or name of the Partnership (except that goodwill may be valued at an amount not exceeding its unamortized cost to the extent it represents a cost to the Partnership), but there shall be taken into consideration any related items of income earned but not yet received, currency exchange adjustments, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, capital gains and other income taxes on disposition of or returns on investments, and the value of options or commitments to purchase securities pursuant to agreements entered into on or prior to a Valuation Date.

**B. Vega's Lawsuit**

Vega originally sued only Fulcrum Power, alleging that he was wrongfully terminated without cause, in breach of the Employment Agreement. He later

4

added a claim for breach of the Joinder Agreement, by which he sought to require Fulcrum Power to repurchase his partnership interest.

Vega also added various tort claims and parties, including several limited partners and Fulcrum Energy, the general partner. The gist of Vega's tort claims was that the defendants had conspired to fraudulently induce Vega to sell Amigo by misrepresenting the partnership's financial condition. The trial court granted the defendants' motion for summary judgment on most of Vega's tort claims, but ruled that Vega could try to the jury his claims for breach of contract, breach of fiduciary duty, and conspiracy to commit breach of a fiduciary duty.[1]

## C. Fulcrum's Pre-trial Challenge to Gilbert Herrera's Testimony

On July 8, 2011, Fulcrum filed a Rule 166(g) motion, requesting that the trial court "rule on the meaning of the limited partnership agreement." Fulcrum contended that Section 21 requires that Vega's partnership interest be valued according to its book value under the asset approach. Fulcrum argued that Gilbert Herrera, Vega's expert witness on valuation of the partnership interest, incorrectly focused on finding the overall business value of comparable companies and used those values to arrive at an overall business valuation for Fulcrum Power. According to Fulcrum, this was inconsistent with Section 21, and "any attempt by

---

[1]     The trial court later granted Fulcrum's motion for directed verdict on Vega's tort claims. Vega does not challenge that ruling or the summary judgment.

[Vega] to introduce evidence as to the overall business (or enterprise) value of Fulcrum Power must be excluded."

In response to the Rule 166(g) motion, Vega argued that Herrera's market approach valuation was sound and that Section 21 does not require that goodwill be specifically calculated and carved out of the valuation. Vega supported his response with Herrera's affidavit, in which Herrera averred that his analysis satisfied Section 21. It stated: "[T]he value I calculated for Plaintiff Javier A. Vega's Partnership Units did not include a value for the 'goodwill or name of the Partnership.'" After hearing argument, the trial court determined it would hear Herrera's testimony on voir dire before ruling.

Herrera's voir dire outside the presence of the jury focused on whether his valuation of Fulcrum Power attributed any value to goodwill. Herrera agreed with Fulcrum's counsel that the net worth, or book value, of Fulcrum Power on the termination date was $35 million, leaving a $63 million difference between Fulcrum Power's net worth and Herrera's $98 million estimate of value. Herrera testified that, post-Sarbanes Oxley, to determine what comprises a company's value in excess of net worth, one must go through an exercise to attribute value to each of the intangible assets that comprise the difference between net worth and the overall value, and that the residual value after all other intangibles have been

6

allocated is deemed to reflect the value of the company's goodwill. He also testified that the Auditing Standard Board issues guidelines by which professionals conduct this process, which he referred to as an allocation of intangibles. Herrera testified that his firm had undertaken that process in other cases, but not this one:

> I didn't do that. We didn't have [sufficient information] available to us. That's a fairly exhaustive process. We've done about a hundred of those, and it's not something you just do. You have to—it's a pretty substantial work product.

He also admitted that, because he did not allocate intangibles pursuant to ASB guidelines, he could not say that doing so would have yielded a $0 value for Fulcrum Power's goodwill.

Despite this, Herrera maintained that he "placed no value on goodwill" and that he did not believe goodwill was included in his $98 million estimate of value. The basis for this opinion was that "service businesses don't tend to generate that sort of value in the absence of some intrinsic intangible value" or, put differently, Fulcrum Power's intangible assets (contract rights, in-place workforce, and the like) appeared to him to be sufficiently robust to comprise at least a significant part of the $63 million gap with which Fulcrum took issue. After extensive questioning, the trial court ruled that it would not exclude Herrera's testimony at that time.

## D. Herrera's Trial Testimony

At trial, Herrera testified that Vega's nearly 2% interest in Fulcrum Power on the termination date was worth $1.98 million.[2] He told the jury that, in reaching that conclusion, he had complied with the requirements of Section 21 by considering and ruling out any goodwill or name value.

Regarding methodology, Herrera testified that he initially looked at "dispositive" historical transactions involving Fulcrum Power to assess the price at which willing buyers and sellers had agreed to buy and sell interests in Fulcrum Power in the past. He opined that none of these transactions involving Fulcrum Power interests placed a value on goodwill or the name of the partnership.

As the second step in the process, Herrera conducted a confirmatory analysis using two sets of comparables—first, a set of publicly traded companies operating in the same SIC[3] code as Fulcrum Power and, second, a set of three precedent comparable transactions. Herrera admitted that two of the three precedent comparable transactions attributed value to goodwill—specifically, he told the jury

---

[2]   The parties agree that Vega had a 1.98% partnership interest on the termination date. In his report and at trial, Herrera opined that the value of Fulcrum Power on the termination date was $97,988,000, which the parties rounded to $98 million for ease of reference at trial and in the briefs on appeal. Herrera opined at trial that 1.98% of the $98 million was $1.98 million, and the jury answered $1.98 million in response to Question No. 2. This may be a slight miscalculation, but neither party complains about it on appeal.

[3]   According to Herrera, companies in the same industry share an SIC (Standard Industrial Classification) code.

that about 13.1% of the total purchase price for those three transactions represented value attributed to goodwill. Despite this, according to Herrera, it was not necessary to subtract any value for goodwill from his valuation of Fulcrum Power because the 13.1% would be offset by the fact that the purchase price in all three transactions would have reflected a discount because they involved the sale of minority interests. But then Herrera testified that if downward adjustment was necessary to account for the fact that the precedent comparable transactions included goodwill, a $60,000 adjustment would be sufficient.

Herrera also testified about the book value of Vega's interest. He told the jury that a company's book value is its "assets less liabilities on a lower cost of market basis" and that Fulcrum Power's book value on the termination date was $35 million, implying a value of $780,000 for Vega's 2% interest. But, he explained, the $35 million book value does not value all of Fulcrum Power's assets that the Partnership Agreement contemplates will be included in a valuation. It therefore implies a value lower than what is described in the Partnership Agreement, which is market value.

On cross-examination, Herrera again agreed that he performed "no analysis" to determine what makes up the $63 million gap between his $98 million estimate of value and Fulcrum Power's $35 million book value. But he maintained that he

9

solved for and did the analysis requisite to determine if, in fact, any value for Fulcrum Power's goodwill or trade name existed as of the termination date. In his view, there were "no conditions evident to suggest goodwill existed in Fulcrum or the value of Fulcrum as of October 3, 2008." He also admitted, as he had on voir dire, that 13% of the value of the precedent comparable transactions used in his comparables analysis was attributable to goodwill and, therefore, goodwill was "embedded" in his ultimate conclusion of Fulcrum Power's value, $98 million.

### E. Verdict and post-verdict motions

The trial court submitted only two issues: 1) did Fulcrum terminate Vega without cause, as defined in the Employment Agreement? and 2) what was the value of Vega's partnership interest as of the date he was terminated? The jury found Vega was terminated without cause and, adopting Herrera's opinion of Fulcrum Power's market value, assessed the value of Vega's 2% partnership interest at $1.98 million.

Fulcrum moved for JNOV. It argued that Herrera's opinion that $98 million did not include goodwill was conclusory and unreliable, because he could not explain what made up the $63 million difference between his $98 million figure and Fulcrum Power's $35 million book value and, therefore, had no basis for asserting that no portion of that $63 million constituted value for goodwill. The

trial court disregarded the jury's answer to question two (the damages question) on the grounds that Herrera did not use the generally accepted method for allocating intangibles, which the trial court believed was necessary in order for Herrera to demonstrate that his valuation attributed no value to Fulcrum Power's goodwill, as Section 21 required. It concluded that Herrera's assertion that no goodwill was included in his valuation "was the type of *ipse dixit* opinion which is prohibited in the case law" and that Herrera's testimony should not have been allowed.

### Discussion

In his first issue, Vega argues that the trial court erred in disregarding the jury's answer regarding the value of Vega's partnership interest and entering JNOV.

### A. Standard of Review

A trial court may grant a motion for JNOV if a directed verdict would have been proper, and it may disregard any jury finding on a question that has no support in the evidence. TEX. R. CIV. P. 301. A trial court may disregard a jury finding and render JNOV if the finding is immaterial or if there is no evidence to support one or more of the findings on issues necessary to liability. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003); *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994).

11

In reviewing the rendition of JNOV, the reviewing court must determine whether there is any evidence upon which the jury could have made the finding. *Tiller*, 121 S.W.3d at 713; *see also B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 15 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The reviewing court must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

To sustain a challenge to the legal sufficiency of the evidence to support a jury finding, the reviewing court must find that (1) there is a complete lack of evidence of a vital fact; (2) the court is barred by rules of evidence from giving weight to the only evidence offered to prove a vital fact; (3) there is no more than a mere scintilla of evidence to prove a vital fact; or (4) the evidence conclusively established the opposite of a vital fact. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 903 (Tex. 2004); *see also Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009) (holding that party may assert on appeal that scientific evidence or expert testimony is unreliable and therefore legally insufficient to support verdict); *Coastal Transp. Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234–35 (Tex. 2004) (holding that expert witness testimony on gross

12

negligence claim was legally insufficient and rendering judgment that plaintiff take nothing).

## B. Applicable Law

The admission of expert testimony is governed by Texas Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995). "Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (*citing Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) and *Robinson*, 923 S.W.2d at 556). In assessing reliability under *Robinson*, the trial court may consider the following non-exclusive factors:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert[ ];

(3) whether the theory has been subjected to peer review and/or publication;

13

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique.

923 S.W.2d at 557.

The Texas Supreme Court has drawn a distinction between challenges to the reliability of an expert's methodology and "no evidence challenges where, on the face of the record, the evidence lacked probative value." *Coastal*, 136 S.W.3d at 233; *accord City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009). "When the testimony is challenged as conclusory or speculative and therefore non-probative on its face, . . . there is no need to go beyond the face of the record to test its reliability." *Coastal*, 136 S.W.3d at 233; *accord Pollock*, 284 S.W.3d at 817. "[E]ven when some basis is offered for an opinion, if that basis does not, on its face, support the opinion, the opinion is still conclusory." *Pollock*, 284 S.W.3d at 817.

Alternatively, expert testimony is unreliable if it is no more than subjective belief or unsupported speculation. *Robinson*, 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 599, 113 S.Ct. 2786, 2800 (1993)). Expert testimony is also unreliable if there is too great an analytical gap between

14

the data the expert relies upon and the opinion offered. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998). In applying this reliability standard, the trial court determines whether the analysis used to reach the expert's conclusions is reliable. *Id.* at 728.

Generally, rulings on objections as to the admissibility of evidence, including whether expert testimony is reliable, are reviewed for an abuse of discretion. *Whirlpool Corp.*, 298 S.W.3d at 638. However, in a no-evidence review, we independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict. *Id.* "[A] no-evidence review encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable." *Id.*

## C. Analysis

Before turning to the merits of the JNOV ruling, we address Vega's contentions that Fulcrum failed to preserve its complaint regarding Herrera's testimony.

### a. Did Fulcrum waive its right to challenge Herrera's testimony?

Vega advances two waiver arguments. First, he argues that the parties' Rule 11 agreement required Fulcrum to challenge Herrera's testimony, if at all, by April 11, 2011, the agreed deadline for filing motions to strike experts, and that the

Rule 11 agreement barred Fulcrum from challenging Herrera after that date. Fulcrum responds that it could not have moved to strike Herrera by April 11 because Herrera did not disclose the offending opinion—that his $98 million value did not include a value for goodwill—in his report. According to Fulcrum, Herrera first disclosed this opinion in his July 15, 2011 affidavit that Vega filed in response to Fulcrum's Rule 166(g) motion.

We reject Fulcrum's argument, because we conclude that a fair reading of Herrera's January 25, 2011 report reflects Herrera's assertion that his analysis complies with Section 21, i.e, does not include goodwill. Herrera did not expressly state that opinion in writing until his July 15, 2011 affidavit, but the fact that Herrera made the claim is clear from his report. We conclude Fulcrum had the information it needed to object to this aspect of Herrera's report by the Rule 11 deadline.

Nevertheless, considering all the circumstances, we decline to find that the trial court abused its discretion in rejecting the contention that the Rule 11 agreement barred Fulcrum's challenges to Herrera's testimony. As will be discussed below, Texas law permits objections to expert testimony to be made even after an expert testifies and the jury has rendered its verdict. *See Pollock*, 284 S.W.3d at 816–17; *Coastal*, 136 S.W.3d 233. The Rule 11 agreement does not

expressly state that it trumps Texas law in this regard, and therefore, the trial court did not abuse its discretion in failing to find that it did. Moreover, Herrera failed to disclose other material and objectionable opinions in his written report. Herrera's report disclosed that his opinion of value was based on his analysis of market comparables and precedent comparable transactions, but it did not disclose that those analyses were merely "confirmatory" or that the "dispositive" transactions in his analysis were Fulcrum Power's own historical transactions. Herrera disclosed this for the first time when he testified during voir dire and at trial. Herrera's report also failed to disclose that if an adjustment were to be made to account for the fact that the precedent comparable transactions included goodwill, it should be an adjustment of $60,000. Herrera disclosed this opinion for the first time when he testified at trial. By definition, Fulcrum could not waive its objection to opinions Herrera had not disclosed by the Rule 11 deadline.

Vega's second waiver argument is that Fulcrum's post-trial objection to the reliability of Herrera's testimony came too late. "[A] party may complain that conclusory opinions are legally insufficient evidence to support a judgment even if the party did not object to the admission of the testimony." *Pollock*, 284 S.W.3d at 816; *see Coastal*, 136 S.W.3d 233. But when an opinion is not conclusory, and instead the basis offered for it is unreliable, a party must object in order to

17

complain that the opinion is legally insufficient to support the verdict. *Pollock*, 284 S.W.3d at 816–17. "To preserve a complaint that an expert's testimony is unreliable, a party must object to the testimony before trial or when it is offered." *Guadalupe–Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002).

We agree with Vega that, to the extent Fulcrum challenges the reliability of Herrera's testimony, Fulcrum was required to object before trial or when the testimony was offered. *See Pollock*, 284 S.W.3d at 816–17. We conclude that it did. Fulcrum first made the trial court aware of its reliability complaint at the hearing on its Rule 166(g) motion, at which the trial court decided it would evaluate Herrera's testimony outside the presence of the jury. After Herrera's voir dire, Fulcrum again pointed out the reliability problem: it argued that Herrera was unable to identify the components of value reflected in the $63 million gap (because he did not do the work), but nevertheless asserted his professional opinion that goodwill was not part of it. Immediately before Herrera testified at trial, Fulcrum's counsel renewed the objection: "That opinion, if allowed to be proffered, does not have any [analytical] connection between what he is saying, the fact that he is just saying it—saying it's so because I say it's so." The record makes clear that the trial court understood, before Herrera testified at trial, that Fulcrum was challenging Herrera's opinion on the basis that Herrera could not

18

reliably opine that his $98 million valuation did not include goodwill when he had not utilized the generally accepted methodology for making that determination. *See Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A*, 249 S.W.3d 380, 387 (Tex. 2008) (the cardinal rule for preserving error is that an objection must be clear enough to give the trial court an opportunity to correct it). This is the same argument that Fulcrum made in its motion for JNOV. Accordingly, we hold that Fulcrum preserved its challenge to the reliability of Herrera's opinion. *See* TEX. R. APP. P. 33.1(a) (to preserve a complaint for review, record must show that complaint was made to the trial court by timely objection that stated grounds for ruling sought with sufficient specificity unless those grounds are apparent, and that trial court ruled or refused to rule on objection); *Arkoma Basin*, 249 S.W.3d at 387 (error preservation requires clear objection that permits trial court to understand party's basis for complaint); *Kraft*, 77 S.W.3d at 807 (where party made clear the basis for the party's objection to expert witness's testimony at the beginning of witness's testimony, complaint was preserved for review).

### b. Did the trial court err in disregarding the jury's answer to Question No. 2?

Vega contends that the trial court erred in concluding that Herrera's testimony was unreliable and therefore insufficient to support the jury's verdict. He argues that Herrera's methodology comported with the Partnership Agreement,

19

because the Partnership Agreement did not require Herrera to undertake a certain accounting exercise to place a value on goodwill and then carve that value out of his valuation. Put differently, Vega argues it was acceptable for Herrera to opine, as he did, that goodwill was *not* included in his valuation; the plain language of the Partnership Agreement did not require him to affirmatively assess a value to Fulcrum Power's goodwill and then deduct it from $98 million. Additionally, Vega contends that Herrera took adequate steps to ensure that the underlying data on which he relied placed no value on goodwill.

We agree with Vega's contention that Section 21 does not specify the method to be used for ensuring that a valuation does not include goodwill. It merely states that "[i]n determining the valuation of . . . the Partnership Interest of any Partner in the Partnership or in any accounting among the Partners, no value shall be placed on the goodwill or name of the Partnership" and identifies items that should be included in the valuation. However, to be reliable, an expert opinion must comport with applicable professional standards. *See KMG Kanal-Muller-Gruppe Deutschland GmbH & Co. KG v. Davis*, 175 S.W.3d 379, 390 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Gammill*, 972 S.W.2d at 725–26). The relevant question here is not what method is generally accepted and reliable for valuing companies generically, but rather, what is a generally accepted and

reliable method by which to arrive at the conclusion that one's valuation does not attribute value to goodwill. Herrera testified that there are ASB guidelines governing how professionals attribute value to intangible assets and goodwill, but that he did not follow them in this case. An expert's decision not to use a process that has been generally accepted as valid by the relevant professional community factors into our *Robinson* analysis. *See Robinson*, 923 S.W.2d at 557. Nevertheless, we are not persuaded by Fulcrum's contention that Herrera's failure to follow the relevant ASB guidelines is a dispositive analytical gap, provided Herrera could demonstrate that the alternate method he used to conclude his valuation did not value goodwill was reliable. But Herrera failed to so.

Herrera repeatedly asserted that his valuation did not include goodwill, but he could not adequately explain how he reached this conclusion, and his own testimony undercut it. Herrera did not expressly address goodwill in his report and, while his July 15, 2011 affidavit asserts the conclusion that goodwill was not included, it provides no basis for it. At his pretrial voir dire, Herrera began by testifying that goodwill was not included. When asked how he determined that, he offered three pieces of testimony. First, he testified that he looked and determined that factors that would indicate the presence of goodwill were not present. Second, he testified that Fulcrum Power's unquantified intangible assets had significant

21

value, meaning, presumably, that they could have comprised the entire $63 million gap and were substantially different from goodwill. Third, he testified that "service businesses like this don't tend to generate that sort of value in the absence of some intrinsic intangible value." Regarding this latter point, Herrera admitted that Fulcrum Power has attributed, at most, $40 million[4] of the $63 million gap to intangibles, leaving at least a $23 million residual amount unaccounted for. This squarely contradicted Herrera's assertion that goodwill did not comprise at least a part of his $98 million valuation and, accordingly, he backtracked and testified that if some amount of goodwill was included, it was "immaterial" or "nominal."

Finally, at trial, Herrera again testified that there was no value for goodwill included in his opinion of value, but then admitted that goodwill represented 13% of the total value of the precedent comparable transactions he used to confirm his opinion of value. He then offered the (previously undisclosed) opinion that $60,000 should be deducted from his valuation if one believed it included goodwill and wanted to exclude it. In short, Herrera not only failed to use existing generally accepted guidelines for concluding that no value is assigned to goodwill, but also failed to demonstrate a reliable basis for his contradictory opinions that 1) his valuation assigned no value to Fulcrum Power's goodwill, and, 2) if it did, it

---

[4]    This $40 million was not recorded on Fulcrum Power's books until 2011, three years after the termination date.

22

assigned only a $60,000 value to it. Accordingly, we hold that Herrera's opinion that his valuation included no value for goodwill was unreliable and amounted to no evidence. *General Motors Corp. v. Iracheta*, 161 S.W.3d 462, 471 (Tex. 2005) (self-conflicting assertions of expert render opinion unreliable); *Robinson*, 923 S.W.2d at 557 (if expert's opinion is unsupported speculation or subjective belief, it is unreliable). Because the jury based its answer to Question No. 2 on this unreliable opinion, the trial court correctly disregarded that finding.

### c. Did the trial court err in entering JNOV?

Ordinarily, we render judgment when we sustain a no evidence issue. *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007). However, when there is evidence to support some damages, it is not appropriate to render judgment. *Id.*; *see ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010). Instead, we must remand to the trial court for a new trial unless we are able to suggest a remittitur. *See Guevara*, 247 S.W.3d at 670. An appellate court "may not order a separate trial solely on unliquidated damages if liability is contested." TEX. R. APP. P. 44.1(b). Therefore, where liability has been contested and the plaintiff seeks unliquidated damages, remand of both liability and damages is required. *See id.; Minn. Min. and Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 740 (Tex. 1997).

23

Here, following the supreme court's recent opinion in *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867 (Tex. 2010), we conclude that we must remand for a new trial on all issues. In that case, ERI sued for, among other things, lost profit damages resulting from alleged breach of contract and other torts committed by a former employee. ERI introduced at trial invoices from the relevant time period and testimony regarding profit margins from its owner in order to prove lost profits damages. *Id.* at 877. The evidence supported a lost profits award of less than $200,000, but the trial court awarded $300,000. *Id.* The supreme court held that, although the plaintiff had failed to prove its entire award of $300,000 in lost profits with certainty, "competent evidence exists to establish some reasonably certain amount of lost profits—just not the particular amount awarded by the trial court." *Id.* at 877–78, 880. The supreme court remanded the case to the court of appeals, directing the court of appeals to consider remittitur, and noting that if the court of appeals was unable to arrive at a disposition concerning remittitur, the court of appeals could instead remand for a new trial. *Id.* at 880.

Likewise, here, the evidence, while not legally sufficient to support the jury's award based on Herrera's $98 million valuation that had goodwill "embedded" in it, constitutes some evidence of the correct measure of damages.

24

*See id.* at 878. Vega argues that Herrera's testimony regarding precedent transactions and public comparables are indicators of Fulcrum Power's value. He also argues that, at a minimum, the parties agree that Fulcrum Power's book value was $35 million on the termination date, and that this too was some evidence upon which the jury could assign a value to Vega's partnership interest.

Fulcrum argues that there is no evidence to support any award of damages, and, therefore, we must render a take-nothing judgment. Specifically, Fulcrum argues that the jury could not rely upon the precedent transactions and public comparables relied upon by Herrera because they are not comparable to Fulcrum Power. Fulcrum also argues that Herrera's testimony that the book value of Fulcrum Power was $35 million on the termination date cannot constitute some evidence upon which the jury could render a verdict, because Herrera testified that book value was not the value the Partnership Agreement contemplated should be used in the valuation.

We agree with Vega. Herrera testified that the $35 million book value does not contain any value for goodwill because it is merely the sum of the company's tangible assets minus its liabilities. Indeed, in Herrera's cross-examination, Fulcrum indicated its agreement that the book value of Fulcrum Power was $35 million and that goodwill was not included in that number. And in its Rule 166(g)

motion, Fulcrum asked the trial judge to declare as a matter of law that the value of Vega's partnership interest was "his percentage of the fair market value determination of the assets and liabilities on Fulcrum Power's balance sheet at the time of his termination," and that this was the only approach permitted by Section 21. Herrera was repeatedly asked about the $35 million book value, and Fulcrum asked him to calculate for the jury the value of Vega's partnership interest based on that value. In response, Herrera testified that Vega's partnership interest would be worth $780,000 using the $35 million book value. This is some evidence regarding the value of Vega's partnership interest. Accordingly, the trial court erred in rendering a take-nothing JNOV. *See id.*, 318 S.W.3d at 877–78, 880; *see also Guevara*, 247 S.W.3d at 670.

Vega urges us to remand for a retrial on damages only. But a remand for a new trial solely on the damages issue is not appropriate in this case, because liability was contested and the damages sought are unliquidated. *See* TEX. R. APP. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested."). Vega argues that liability was never "contested," because Fulcrum stipulated the amount of damages due to Vega under his Employment Agreement in the event the jury decided Vega was terminated without cause. We agree with Fulcrum that liability *was* contested because the

26

parties hotly disputed the question that predicated any liability under the Employment Agreement or the Joinder Agreement: whether Vega was terminated without cause. Apart from Vega's request that we render judgment on the unsupported jury verdict, neither party urges any rendition point on appeal. Remand of both liability and damages is required. *See id.*; *Nishika Ltd.*, 953 S.W.2d at 740.

We therefore sustain Vega's first issue in part, reverse the trial court's JNOV, and remand for a new trial on all issues. Because we are reversing the judgment and remanding the cause for a new trial, we do not reach Vega's second issue regarding attorney's fees or Fulcrum's conditional cross-points, which afford no greater relief than a new trial.[5]

---

[5] In its conditional cross-points, Fulcrum asserts that the evidence is factually insufficient to support the jury's finding that Vega was terminated without cause and the jury's damage finding. The only remedy requested, and permitted, for these points is a new trial. *See Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 626 (Tex. 2004). Fulcrum's third cross-point is that the trial court abused its discretion in admitting Herrera's testimony, and it requests remand for a new trial on this basis as well.

## Conclusion

We reverse the judgment of the trial court and remand for a new trial.

Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.