**Donna GREEN, et al., Appellants,**

v.

**Jacquelyn Fife GREEN, Appellee.**

**No. 01–83–0616–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Sept. 13, 1984.

Joann Carr, Dalton L. Jones, Gregg, Jones & Mieszkuc, Houston, for appellants.

Lloyd M. Lunsford, J. Edwin Smith, Houston, for appellee.

Before WARREN, BULLOCK and BASS, JJ.

OPINION

BASS, Justice.

Appellants filed suit to set aside the will of the deceased, Charles Nelson Green, claiming that he lacked the capacity to make a will, and that the will offered into probate was executed under the undue influence of his third wife, Jacquelyn Fife Green. The court instructed a verdict on the issue of capacity, but submitted a

charge to the jury on the issue of undue influence. The jury returned a verdict finding that the will was a product of the wife's undue influence; however, the court entered judgment non obstante veredicto and admitted the will to probate.

We reverse the trial court's judgment.

The deceased, Charles Nelson Green, discovered he was terminally ill with lung cancer in May of 1979, and after surgery, radiation treatment, and chemotherapy, died on Christmas day of that same year. Two weeks prior to his death, Mr. Green executed a new will leaving his entire estate to his third wife, the proponent. It is that will which was the subject of the proceeding brought by the three children from his prior marriages: Donna, Carole, and Charles ("Chuckie"), a minor son.

At trial, the contestants argued that the will submitted to probate was an unnatural disposition by the testator. In support of this contention, the contestants offered evidence of the short length and tumultuous nature of the deceased's marriage to the proponent, including several periods of separation, and the fact, while not particularly relevant, that the proponent re-married within a month after their father's death.

The appellee admitted that the marriage to the deceased was not without problems; however, she claimed they arose from the deceased's excessive drinking, and claimed that it was that fact which led to their separation and her filing for divorce in November, 1978. The divorce action was dismissed three days later.

A family friend, Mary Kerr, disputed the proponent's explanation and testified that the couple's fights were over the wife's dislike for the deceased's children and, in particular, his youngest son, "Chuckie". She said she based her conclusion on the fact that on two occasions the proponent had become so angry that she threatened the child and his father with a shotgun, and sent them running into the night, clad only in pajamas. The witness testified that it was because of the animosity between the deceased's children and the proponent, that when he, the deceased, told her of his dis-

ease and impending death, she questioned him about his will. In reply to that inquiry, he allegedly said, "(D)on't worry, I will take care of my boy." The deceased's daughter, Carole, testified that her father had also left her with the impression that he intended to leave his business, Mitch's Steak House, to his minor son. In fact, it was her testimony that this impression was confirmed by the proponent, when Carole visited with her father during his final hospitalization. Carole testified that on that occasion, the proponent told her that they had both changed their wills to include all of their children, and her father, who was also in the room, nodded his head in agreement.

The proponent testified that the deceased named her as the sole beneficiary of his estate because he knew that she would take care of his children in the event they needed help. However, in addition to the evidence presented of the poor relationship between the parties, the children also testified that since their father's death, the proponent had terminated the $100.00 per month the deceased was sending to help support his daughter, an accounting student at Texas A & M, refused to give his son any of his father's personal effects, and did not place a headstone on the deceased grave until many months after his death.

The deceased was hospitalized numerous times between August and November of 1979 and was constantly in some level of pain until his death in December. In order to alleviate some of his discomfort, the deceased's physician prescribed percodan, which he took regularly until November. By late November, the deceased's pain had so dramatically increased that his doctor prescribed morphine injections, together with medication intended to enhance its effect. The proponent maintained, controlled, and administered these injections. However, she testified that she gave them to the deceased only as prescribed.

On September 6, 1979, the deceased executed a will leaving his entire estate to the proponent. However, according to the pro-

ponent, he later destroyed that instrument, and told her he intended to execute a new one. Byron McCullough, an attorney and the deceased's landlord, was contacted by the proponent in November and asked to prepare the deceased's will. He had not prepared the earlier document, nor did he speak to the deceased prior to drawing the will at issue. He received his instructions from the proponent, who told him to prepare a will reciting the same terms as the September document, but to change the executrix of the estate to the proponent's sister.

On December 4, 1979, the proponent and the deceased executed wills drawn by McCollough, in which each left his or her estate to the other, and in the event of a common disaster, to their children. McCollough testified that he asked that the deceased be seen by a doctor on the morning immediately prior to the will's execution, and this was done. He also said that when he saw the deceased on the morning of the will's execution, he explained the terms of the document, which were agreed to by the deceased. McCollough then witnessed the deceased sign the will and initial each page. The will was formally witnessed by a friend of the proponent's and her sister's husband.

The appellants theorized that the deceased was unduly influenced by the proponent by her control of his pain medication over the months prior to his hospitalization and her order that the medication be withheld on the morning the will was signed. It was undisputed that the deceased was extremely dependent on his pain medication and that the proponent ordered the medication withheld on the morning of the will's execution. The proponent testified that she did this at the deceased's request, which was in anticipation of the execution procedures the following morning. However, the hospital records reflect that on the morning of the signing, the deceased requested pain medication, but his request was denied pursuant to the proponent's instructions. Moreover, the proponent denied the deceased was in pain or requested any medication on that morning, even though his doctor testified that the deceased's advanced condition kept him in constant pain. The deceased died within two weeks after the will was executed. Finally, the opponents introduced the inventory of their father's estate, prepared and signed by the proponent, in which she listed all of the deceased's assets, whether separate or community property, as community property.

At the close of the evidence, the trial court concluded that there was no evidence to support a charge on testamentary capacity, and it directed a verdict on that issue. It then submitted the issue of undue influence; however, after the jury found that the will was the product of undue influence, the judge entered a judgment non obstante veredicto and admitted the will to probate.

██ In their first point of error, the appellants contend that the trial court erred in failing to enter judgment in accordance with the jury's verdict. To sustain an action by the trial court in granting a motion notwithstanding the verdict, it must be determined that there was no evidence to support the jury's findings. *Williams v. Bennett*, 610 S.W.2d 144 (Tex. 1981). The *Williams* court further stated that, in making such a determination, "we must review the judgment in the light most favorable to the jury findings, considering only the evidence and inferences which support them, and rejecting the evidence and inferences which are contrary to the findings." *Id.* at 145; see, *Dodd v. Texas Farm Products Co.*, 576 S.W.2d 812 (Tex. 1978); *Douglass v. Panama, Inc.*, 504 S.W.2d 776 (Tex.1974). If, after this review, there exists any evidence in support of the jury findings, the judgment of the trial court must be reversed and judgment entered in accordance with the jury's verdict. In making this determination, we must first differentiate between the theories of undue influence and lack of testimentary capacity. In *Long v. Long*, 133 Tex. 96, 125 S.W.2d 1034 (1939), the court defined "testamentary capacity" and "un-

due influence," stating that while "testimentary capacity" implied the want of intelligent mental power, "undue influence" was the existence of testamentary capacity *subjected to and controlled by* a dominent influence or power. See also *Rothermel v. Duncan,* 369 S.W.2d 917 (Tex.1963). In this case the court directed a verdict on the issue of capacity; therefore, the issue becomes who controlled that capacity, the deceased or someone else.

 The elements necessary to prove "undue influence" are: (1) the existence and exertion of influence; (2) the effective operation of the influence so as to subvert and overpower the mind of the testator at the time of the will's execution; and (3) the execution of a testament which the maker thereof would not have executed but for such influence. *Rothermel, supra,* at 902; *Stewart v. Miller,* 271 S.W. 311 (Tex.Civ. App.—Waco 1925, writ ref'd).

To prevail on this appeal, the contestants must have introduced some satisfactory proof on each of the above elements; however, by the very nature of these elements, such proof can be and usually is circumstantial. *Rothermel, supra.* Moreover, if all of the circumstances shown or established, when considered together, produce some evidence that a foreign influence was exerted and it overpowered the mind of the deceased and resulted in the proffered will, the trial court's judgment must be reversed. See, *Barksdale v. Dobbins,* 141 S.W.2d 1035 (Tex.Civ.App.—Texarkana 1940, writ ref'd).

 However, circumstantial evidence which is equally consistent with the proper execution of the testator's intent is considered no evidence of undue influence. *Rothermel, supra,* at 922. In the present case, it is certainly true that the majority of the circumstances are consistent with the proper execution of the will by the testator: his need to arrange his affairs; the husband-wife relationship; her nuturing of the deceased during his illness, including her administering his injections; the wife's making the arrangements for her invalid husband's will; and the witnessing of the will by two family friends.

However, when these circumstances are considered together with the other facts in the case, there is at least some evidence of undue influence necessary to support the jury's verdict. This evidence included: 1) the testator's heavy dependence on morphine; 2) his revocation of an almost identical will dated September 6th, with the expressed desire to prepare a new one; 3) his repeated expression of his intent to provide for his son; 4) the proponent's own statement that the new will was to be changed to provide for the children; and 5) the evidence introduced which cast doubt on the credibility of the proponent, i.e., the incorrect inventory, her statement that her husband was not in pain, etc.

We find the above testimony is some evidence of undue influence, and, accordingly, reverse the judgment non obstante verdicto and order that judgment be entered in accordance with the jury's verdict.