Bernice YOST, Special Conservator
for Georgia Cox, Appellant

v.

James FAILS, Appellee

NO. 01-15-00773-CV

Court of Appeals of Texas,
Houston (1st Dist.).

Opinion issued June 13, 2017

Rehearing Denied October 24, 2017

Thomas C. Wright, Wanda McKee Fowler, Kenneth J. Fair, Andrea G. Tindall, WRIGHT & CLOSE, LLP, One Riverway, Suite 2200, Houston, TX 77056, for Appellant.

Michael Scott Thomas, THOMAS & WILLIAMS, L.L.P., 2626 S. Loop West, Suite 561, Houston, TX 77054, for Appellee.

Panel consists of Justices Massengale, Brown, and Huddle.

## OPINION

Rebeca Huddle, Justice

A jury found that Sara McGowan signed a 2011 will as a result of undue influence and that James Fails, her nephew and the primary beneficiary of the 2011 will, lacked good faith and just cause when he sought to probate the will. The jury also found that Fails tortiously interfered with the inheritance rights of McGowan's sister, Georgia Cox, who was the beneficiary under McGowan's earlier will, and awarded damages in the amount of $525,000. But the probate court granted Fails's motion for judgment notwithstanding the verdict and admitted the 2011 will to probate. Bernice Yost, as special conservator for Cox, appeals, contending that the probate court erred by rendering a judgment notwithstanding the jury's verdict because all of the jury's findings are supported by sufficient evidence.

We agree with Yost, in part, and conclude that the probate court erred in setting aside the jury's findings of undue influence and lack of good faith and just cause. With respect to Cox's tortious interference with inheritance claim, however, we conclude that insufficient evidence supports the jury's award of $525,000. Accordingly, we (1) vacate the probate court's order admitting the 2011 will to probate; (2) affirm the portion of the judgment awarding Yost the attorney's fees she incurred in the will contest; (3) reverse the remainder of the trial court's judgment; (4) reinstate the jury's findings that McGowan signed her 2011 will as a result of undue influence and that Fails did not act in good faith and with just cause in trying to probate the 2011 will; and (5) remand this cause to the probate court with instructions to conduct any further necessary probate proceedings and for further proceedings consistent with this opinion.

## Background

Sara McGowan was in her nineties and lived alone when she fell and had to be hospitalized. In January 2011, after her discharge and brief convalescence at a rehabilitation center, she moved in with her nephew, James Fails. McGowan granted Fails power of attorney, and he began managing her finances and using McGowan's money to enrich himself. Ten months later, in November 2011, McGowan signed a new will naming Fails her primary beneficiary. McGowan died in hospice care shortly thereafter, in March 2012.

Fails applied to probate McGowan's 2011 will, but McGowan's niece, Bernice Yost, opposed the application on behalf of her mother, Georgia Cox, who is McGowan's sister. As special conservator for Cox, Yost alleged that the 2011 will was invalid because McGowan signed it as a result of Fails's undue influence. Yost filed a cross-application to probate McGowan's 1979 will, under which Cox was the sole beneficiary. Yost also alleged that Fails tortiously interfered with Cox's inheritance rights.

Both the will contest and the tortious interference claim were tried to a jury, which found that:

- McGowan signed the 2011 will as a result of undue influence;
- Fails did not act in good faith and with just cause in seeking to have the 2011 will admitted to probate;
- Yost acted in good faith and with just cause in seeking to have McGowan's 1979 will admitted to probate; and
- Fails tortiously interfered with Cox's inheritance rights.

The jury awarded Yost $133,000 in attorney's fees in connection with the will contest as well as conditional fees for any appeal. It awarded $525,000 in damages for tortious interference with Cox's inheritance rights.

Fails moved to disregard the jury's findings regarding undue influence, his lack of good faith and just cause, and tortious interference. *See* TEX. R. CIV. P. 301. The probate court granted Fails's motion and entered judgment denying Yost any relief on her claims of undue influence and tortious interference with inheritance. It also admitted the 2011 will to probate.

On appeal, Yost challenges the judgment notwithstanding the verdict. Because we are called upon to evaluate the legal sufficiency of the evidence supporting the jury's findings, we begin by summarizing the evidence at trial.

### McGowan becomes dependent on Fails

Fails testified that he lived with McGowan for part of his childhood, after his mother passed away. He testified that they kept in touch over the years and that he visited her in the hospital after she fell and arranged her subsequent stay at a rehabilitation center. Fails testified that McGowan moved in with him in January 2011 at his suggestion. He said McGowan did not want to return to her home because she already had fallen there twice, and he did not know of anyone else who offered to take in McGowan.

Other family members testified and disputed Fails's claim that he had a close relationship with McGowan. McGowan's cousin, Elizabeth Moore, testified that she asked McGowan whom to contact about her fall and hospitalization, and McGowan did not want Fails informed. Indeed, Fails testified that he only learned of McGowan's fall by inadvertently calling Yost.

McGowan was frail and in ill health when she moved in with Fails in early 2011. She had cataracts, a colostomy bag, and hearing poor enough to require hearing aids. McGowan could not drive, cook, bathe, or dress herself, and she used a wheelchair or walker to get around. Fails described her as "totally unable to physically attend to her own needs" from the time that she came to live with him until her death. Yost agreed that, after her late 2011 hospitalization, McGowan "was not able to live alone" and was totally dependent on Fails.

Moore, her daughter Darlene Hardin, and Yost each testified that they were close to McGowan and remained in contact with her after she moved in with Fails. However, Hardin said that it was not easy to arrange to see McGowan while she lived with Fails. Hardin also testified that McGowan spoke more freely on her cell phone than on the home phone, but McGowan's cell phone service was discontinued at some point. After that, Hardin testified that when she called McGowan it seemed like "she couldn't talk." Yost testified that she spoke with McGowan regularly before her fall, but the frequency of their calls decreased after McGowan moved in with Fails. According to Yost, McGowan became "reserved, and she didn't have much to say on the phone."

### McGowan grants Fails power of attorney and Fails depletes McGowan's assets

It is undisputed that McGowan granted Fails a power of attorney shortly after she moved in with him. But there was conflicting testimony about how that came to be. Fails testified that McGowan told him to have the document prepared. But Hardin testified that McGowan did not want Fails to control her finances, and both Hardin and Moore testified that Fails told McGowan that executing a power of attorney in his favor was a condition of her coming to live with him.

It is undisputed that, once the power of attorney was executed, Fails relied on it to transfer significant sums out of McGowan's accounts. And Fails transferred some of McGowan's money to his own checking account and accounts belonging to his girlfriend's grandchildren.

For example, in January 2011, when McGowan moved in with Fails, Omni Account 9951, for which McGowan and Moore were joint tenants with survivorship rights, held $380,000. Within three months, Fails transferred $250,000 from this account to a new account, Chase Account 5339, which was in McGowan's name with Fails as an additional signatory in his capacity as the holder of her power of attorney, and another $100,000 from the Omni Account 9951 into Chase Bank Account 0374.

Fails testified that he made these transfers at McGowan's request after some jewelry disappeared from her home. He explained that Moore was the only other person with keys to McGowan's home and that McGowan wanted the funds in her joint account with Moore removed to safeguard them from theft.

Despite this purported effort to safeguard McGowan's money, Chase Account 5339 was depleted. Bank records showed that in February and March 2012—just before McGowan's death—Fails transferred over $250,000 from Chase Account 5339 to his own personal checking account. Two days after McGowan's death, he transferred the remaining balance—over $50,000—to two trust accounts for the grandchildren of his girlfriend, Barbara Dunlavy. Fails claimed that McGowan had instructed him to fund Dunlavy's grandchildren's accounts, but he could not explain why he moved more than $250,000 from Chase Account 5339 into his personal checking account.

The story of McGowan's Chase Account 0374 is similar. When Fails became a signatory in March 2011, the account's balance exceeded $60,000. Later, significant additional funds, including the $100,000 transfer from Omni Account 9951 mentioned above, and another $60,000 from McGowan's accounts at Smart Financial Credit Union, were transferred into Chase Account 0374. But just days after McGowan's death, Chase Account 0374 held less than $7,000. The account statements in evidence showed that between March 2011 and March 2012, Fails spent more than $260,000 from Chase Account 0374.

Fails testified that he spent McGowan's money on her care and household expenses, but conceded that he did not have receipts. He also conceded that some of McGowan's money went towards his own personal household expenses, adding that McGowan agreed to "more or less pay for everything" when she moved in with him.

Other witnesses contradicted Fails's account that McGowan was voluntarily gifting Fails money, maintaining that the transfers were unauthorized and that Fails took McGowan's money and kept her in the dark by denying her access to her own checkbook and bank statements. For example, Moore testified that McGowan did not want Fails to be a signatory on her

accounts. She also testified that McGowan once asked her to check on Omni Account 9951 and was "upset, disappointed" when Moore informed her that $200,000 had been moved out of the account. On another occasion, Fails saw Moore and McGowan reviewing McGowan's checkbook, and Fails subsequently placed McGowan's checkbooks "under lock and key." Moore testified that when McGowan confronted Fails about the bank accounts, Fails "cussed" at McGowan.

Fails also enriched himself with the proceeds of McGowan's annuity and life insurance policies. Fails terminated McGowan's Southern Financial Life Insurance Policy for its cash value of $1,759, and deposited that amount into his personal checking account in June 2011. And three days after McGowan died, Fails requested the surrender value of an annuity, around $45,000, from Jackson National Life Insurance. He initially deposited these funds in Chase Account 5339, but then transferred a nearly equivalent amount from Chase Account 5339 to his personal checking account the following month.

### Fails facilitates McGowan's execution of the 2011 will

McGowan's 1979 will bequeathed all of her property to Cox. Under the 1979 will, Fails would inherit only if Cox predeceased McGowan. In that event, Fails would inherit one fourth of McGowan's estate, as would Yost and two other family members.

But in November 2011, after ten months of living with Fails, McGowan signed a new will revoking her 1979 will and naming Fails her primary beneficiary and executor of McGowan's estate. The new will made no mention of Cox or Yost.

Fails testified that he was aware that McGowan had a preexisting will, but he claimed not to know its terms. He claimed to have been unable to find it at McGow-

an's house. Fails's girlfriend, Dunlavy, testified that McGowan told her that she needed a new will because the 1979 will had been stolen.

Like the power of attorney, the 2011 will was prepared by Attorney Maelissa Lipman of Lipman & Associates, with which Fails had had an earlier attorney-client relationship. Fails paid for the will and helped with its preparation. He drafted a handwritten list of McGowan's bequests and acted as an intermediary between Lipman and McGowan. In particular, Lipman sent a draft will to Fails, who testified that he discussed its terms with McGowan due to her poor eyesight.

Lipman testified that she prepared the will according to McGowan's instructions and denied that anyone else told her what to do. But she acknowledged that she could not say what happened outside of her office, what conversations Fails and McGowan may have had before the will's execution, or whether McGowan was subject to anyone's influence. Lipman also testified that she had no memory of discussing potential conflicts of interest with McGowan. Nor did Lipman recall disclosing to McGowan that Fails was a preexisting client of the firm.

Fails drove McGowan to Lipman's office to sign the 2011 will, and Lipman testified that she "went over" the will's terms with McGowan. But there was conflicting testimony about whether Fails was in the room when McGowan signed it. Moore testified that McGowan said Fails was present, and Fails denied being present. For her part, Lipman testified that Fails could have been present, but she could not be certain.

Dunlavy claimed that McGowan changed her will because she had decided that Cox no longer needed an inheritance given Cox's poor physical health. But the testimony conflicted on this point too: Moore

and Yost testified that they knew of no reason McGowan would have disinherited her sister. And when Moore, Hardin, and Yost learned of the new will, they each concluded it did not reflect McGowan's wishes. So Moore and Hardin went to McGowan's home in search of her earlier will, which they located after about an hour.

The jury returned a verdict in Yost's favor, but the probate court granted Fails's motion for judgment notwithstanding the verdict, from which Yost appeals.

## Discussion

Yost contends on appeal that the trial court erred by disregarding the jury's findings on undue influence, Fails's lack of good faith and just cause, and tortious interference with inheritance, because all of the jury's findings are supported by sufficient evidence.

## I. Standard of Review

■ A trial court's ruling on a motion for judgment notwithstanding the verdict is reviewed for legal sufficiency. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009). We consider the proof in the light most favorable to the verdict, crediting evidence in its favor if a reasonable juror could and disregarding contrary evidence unless a reasonable juror could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Unless the proof is legally insufficient to support a jury finding, we must uphold the finding. *Tanner*, 289 S.W.3d at 830; *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam). The proof is legally insufficient if: there is no proof of a vital fact; rules of law or evidence bar the court from giving any weight to the only proof of a vital fact; the proof supporting a vital fact is no more than a scintilla of evidence; or the proof conclusively shows

the opposite of a vital fact to be true. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). In addition, the proof is legally insufficient when circumstantial evidence is equally consistent with either of two facts and any plausible inference as to which one is correct is no more than a guess. *City of Keller*, 168 S.W.3d at 813–14; *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001). Similarly, the trial court may not set aside a negative jury finding and substitute its own affirmative finding unless the proof conclusively establishes the matter. *Tanner*, 289 S.W.3d at 830.

## II. Sufficient evidence supports the jury's finding of undue influence.

### A. Applicable Law

■ A will contest based on a claim that the will was procured by undue influence has three elements: (1) an influence existed and was exerted, (2) the exertion of the influence subverted or overpowered the mind of the testator at the time she signed the will, and (3) the testator would not have made the will but for the influence. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *In re Estate of Woods*, 542 S.W.2d 845, 847 (Tex. 1976); *Guthrie v. Suiter*, 934 S.W.2d 820, 831 (Tex. App.—Houston [1st Dist.] 1996, no writ). To satisfy the first element, the party contesting a will must show that an influence existed and was exerted. *Rothermel*, 369 S.W.2d at 922. The focus is on the opportunities for the exertion of the alleged influence, the circumstances of the drafting and execution of the will, the existence of a fraudulent motive, and whether the testator was habitually under the control of another. *Id.* at 923. The exertion of influence, however, cannot be inferred from opportunity alone, such as might result from taking care of the testator or seeing to her needs. *Id.* There must be

proof showing both that the influence existed and that it was exerted. *Id.*

To satisfy the second element, the contesting party must show that the exertion of the influence subverted or overpowered the mind of the testator at the time she signed the will. *Id.* at 922. The focus of this element is on the testator's state of mind and evidence relating to her ability to resist or susceptibility to the influence of another, such as mental or physical infirmity. *Id.* at 923. But evidence that a testator was susceptible to influence or incapable of resisting it does not prove that her free will was in fact overcome when the will was made. *Id.*; *see, e.g.*, *Guthrie*, 934 S.W.2d at 832. Likewise, close relations or the provision of care standing alone do not suffice to show undue influence. *See, e.g.*, *Guthrie*, 934 S.W.2d at 832; *Evans v. May*, 923 S.W.2d 712, 715 (Tex. App.—Houston [1st Dist.] 1996, writ denied). Influence is undue only if the volition of the testator is destroyed and the resulting will expresses the wishes of the one exerting the influence. *Rothermel*, 369 S.W.2d at 922. Such undue influence may include force, intimidation, duress, importunate requests or demands, or deceit. *Id.*

To meet the third element, the contesting party must show that the testator would not have made the challenged will but for the influence. *Id.* In general, this element focuses on whether the will is unnatural in its disposition of property. *Id.* at 923. A disposition may be unnatural, for example, if it excludes a testator's natural heirs or favors one heir at the expense of others who ordinarily would receive equal treatment. *See Long v. Long*, 133 Tex. 96, 125 S.W.2d 1034, 1036 (1939). Whether a particular disposition is unnatural, however, usually is for the factfinder to decide based on the circumstances. *See Craycroft v. Crawford*, 285 S.W. 275, 278–79 (Tex. 1926). The disinheritance of close relatives

or loved ones is not necessarily an unnatural disposition. *See, e.g., Guthrie*, 934 S.W.2d at 832 (exclusion of testator's only living son from will not unnatural given strained and distant relationship between him and his mother). But a testator's preference for one heir over others of an equal or similar degree of kinship may be unnatural if the record does not disclose a reasonable basis for the preference or contains proof that calls the preference into question or discredits it. *See Curry v. Curry*, 153 Tex. 421, 270 S.W.2d 208, 213 (1954); *Rothermel*, 369 S.W.2d at 923–24; *Craycroft*, 285 S.W. at 278–79.

No two suits alleging undue influence are the same. *Rothermel*, 369 S.W.2d at 921. The outcome of each case depends on its own unique facts. *Pearce v. Cross*, 414 S.W.2d 457, 462 (Tex. 1966); *Fillion v. Troy*, 656 S.W.2d 912, 915 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). Undue influence is seldom provable by direct testimony. *Long*, 125 S.W.2d at 1036; *Green v. Green*, 679 S.W.2d 640, 644 (Tex. App.—Houston [1st Dist.] 1984, no writ). It may be proven by direct or circumstantial evidence. *Rothermel*, 369 S.W.2d at 922; *Fillion*, 656 S.W.2d at 915. Even if no one circumstance standing alone suffices to show undue influence, several may do so together. *Rothermel*, 369 S.W.2d at 922. Circumstantial evidence must do more than raise suspicion though. *Id.* at 923. The distinction between evidence that suffices to show undue influence and that which is merely suspicious defies articulation; it essentially is a matter of degree. *Boyer v. Pool*, 154 Tex. 586, 280 S.W.2d 564, 566 (1955). But if the circumstances are equally consistent with undue influence and its absence, then undue influence is unproven. *Rothermel*, 369 S.W.2d at 922.

**B. Analysis**

█ Fails concedes that there is legally sufficient evidence that he had the opportunity to influence McGowan but argues that there is insufficient evidence of two elements of undue influence: that he exerted his influence on McGowan to such an extent that he subverted or overpowered McGowan's mind and thereby procured a will she otherwise would not have made.

█ When the relevant witnesses are available, their testimony about the planning and preparation of the challenged will is central to a claim of undue influence. *Boyer*, 280 S.W.2d at 566. The focus of this element is on the testator's state of mind and evidence relating to her ability to resist or susceptibility to the influence of another, such as mental or physical infirmity. *Rothermel*, 369 S.W.2d at 923. But influence is undue only if the volition of the testator is destroyed and the resulting will expresses the wishes of the one exerting the influence. *Id.* at 922. Undue influence may take the form of force, intimidation, duress, importunate requests or demands, or deceit. *Id.*

The jury heard evidence that, in the months preceding the execution of the challenged will, McGowan was frail and in poor physical health, lived with Fails in his home, and was totally dependent on him for all of her basic needs. There was also evidence that McGowan's cell phone was disconnected and that she became less communicative during this time. Hardin testified that McGowan was afraid to speak openly, testifying that McGowan seemed afraid to talk on the telephone.

It is undisputed that Fails assumed management of McGowan's finances and used a power of attorney to transfer funds from McGowan's accounts into his personal checking account. Hardin and Moore testified that Fails insisted on this power of attorney, making it a condition of McGow-

an living with him. And Hardin testified that McGowan did not want to give Fails this power and was upset when she learned how Fails was spending her money. There was also evidence that Fails cut off McGowan's access to her financial information by placing it "under lock and key" and that he "cussed" at McGowan when she complained about Fails's use of her money.

With respect to the preparation and execution of the 2011 will itself, there was evidence that Fails steered McGowan to Lipman, who prepared the 2011 will and whose firm previously represented Fails. Lipman testified that she did not recall telling McGowan about any potential conflict of interest, notwithstanding that Fails was a preexisting client and the 2011 will made him McGowan's primary beneficiary. Indeed, Lipman did not recall telling McGowan that Fails was a preexisting client of the firm. Nor is there any evidence that Lipman advised McGowan that she could or should consult her own conflict-free attorney.

There was evidence that Fails paid the firm for the preparation of the will and that he assisted in the planning of the will by, among other things, supplying his own will as a template for McGowan's and drafting a handwritten list of McGowan's bequests. Further, he acted as an intermediary between the firm and McGowan; the firm sent a draft of the will to McGowan, care of Fails, and he went over its terms with her. And Fails drove McGowan to Lipman's office to execute the will. There was conflicting testimony regarding whether Fails was in the room when McGowan signed it, and the jury was free to credit the version adverse to Fails. Likewise, the jury heard evidence to support a finding that the disposition under the 2011 will, under which Fails became the new primary beneficiary and Cox, McGowan's pre-

vious beneficiary, was disinherited, was unnatural given the nature of McGowan's relationships with her family members.

In short, considering the cumulative effect of the evidence concerning McGowan's susceptibility and dependence on Fails, Fails's misuse of McGowan's finances and the power of attorney, and the details surrounding the planning and preparation of the 2011 will, we hold that reasonable jurors could conclude that Fails exerted his influence and subverted or overpowered the mind of McGowan at the time she signed the will. *See Long,* 125 S.W.2d at 1036–38 (evidence sufficed to create fact issue on undue influence where it showed that testator was elderly, frail, and ill; testator was in care of her son, who managed her business affairs; son was beneficiary of new will, under which he received more than he otherwise would have received at expense of others; son employed and paid attorney who made new will and gave him instructions as to how it should be written); *Folsom v. Folsom,* 601 S.W.2d 79, 81 (Tex. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (affirming jury finding of undue influence where evidence showed that testator was alcoholic, infirm, and ill with cancer; testator was in care of his brother, who managed his business affairs; brother was sole beneficiary of new will, which disinherited testator's children; brother's attorney drafted will and gave it to him to deliver to testator).

Relying on other proof in the record, Fails contends that there are innocent explanations for the evidence Yost cites as supportive of the jury's verdict. But this contention disregards the standard of review. This is an appeal from a judgment notwithstanding the jury's verdict in Yost's favor. We are obliged to view the proof in the light most favorable to the verdict and discount any contrary proof unless a reasonable juror could not. *See City of Keller,*

168 S.W.3d at 827. Given the proof at trial, a reasonable juror could have disbelieved Fails's explanations. Neither we nor the probate court may second-guess the jury's evaluation of conflicting evidence and witness credibility. *See id.* at 819; *Long,* 125 S.W.2d at 1036.

Fails also argues that the probate court correctly disregarded the jury's findings because the evidence was equally consistent with undue influence and its absence. *See Rothermel,* 369 S.W.2d at 922; *see also Lozano,* 52 S.W.3d at 148. In particular, Fails asserts that the fact that McGowan was in his care "is equally consistent with innocence or wrongdoing." But the record includes more than just evidence of McGowan's dependence on Fails, and Fails's opportunity to exert undue influence on her. It contains critical and uncontroverted evidence that Fails exploited his power of attorney to make transfers of McGowan's funds for his benefit. This is some evidence that is not equally consistent with the absence or presence of undue influence. *Rothermel,* 369 S.W.2d at 922 (undue influence may include force, intimidation, duress, importunate requests or demands, or deceit); *see also Green,* 679 S.W.2d at 644 (agreeing that some circumstances were equally consistent with proper execution of will but reversing judgment notwithstanding jury's verdict finding of undue influence because record also contained other evidence supporting finding).

Fails further argues that no evidence shows that he overbore McGowan's free will at the time McGowan executed the 2011 will. We disagree. Fails and Lipman had a prior attorney-client relationship, and Lipman knew of Fails's active involvement in planning the 2011 will, yet Lipman prepared—and Fails paid for—a will that named Fails the primary beneficiary of McGowan's estate without counseling McGowan about the potential conflict. It is

undisputed that Fails handwrote the bequests that were incorporated into the will and discussed the terms of the draft with McGowan, and the jury could have credited the conflicting evidence that Fails was in the room when the frail McGowan signed the 2011 will. Cumulatively, this is some evidence contemporaneous with the making of the will from which the jury reasonably could have concluded that the will reflected Fails's wishes rather than McGowan's. *See Long*, 125 S.W.2d at 1037 (fact that beneficiary of new will hired, instructed, and paid attorney who drafted it could "be considered with tremendous force against" beneficiary and will under the circumstances); *cf. Curry*, 270 S.W.2d at 213 (fact that beneficiary hired, advised, and paid attorney who prepared instrument does not, standing alone, prove undue influence, but may serve as proof of it in combination with other proof probative of undue influence).

Moreover, while there must be proof that McGowan's free will was subverted by Fails when she made the 2011 will, events that took place over a more extended period of time inform the analysis. *See Rothermel*, 369 S.W.2d at 922 (finding of undue influence typically rests on proof of a course of dealings over an extended period of time); *Long*, 125 S.W.2d at 1038 (proof relevant to undue influence was "very extended" and included "a course of dealings and conduct" that extended "over a number of years"). Accordingly, it was permissible for the jury to consider not only the events immediately surrounding the execution of the 2011 will, but all of the other evidence of Fails's conduct before and after its execution.

Finally, Fails posits that the 2011 will did not make an unnatural disposition of McGowan's property. *See Rothermel*, 369 S.W.2d at 923. He relies in part on the fact that he and Cox were collateral heirs, *see*

TEX. EST. CODE § 201.001(e), and that he was an alternate executor and alternate beneficiary in McGowan's prior will. Fails argues that these and other circumstances provide a reasonable explanation for his status as the primary beneficiary under McGowan's 2011 will. Fails effectively argues that a will makes an unnatural disposition of property only if there is no reasonable explanation for its provisions. *See Rothermel*, 369 S.W.2d at 924.

This contention misconstrues the law. The Supreme Court of Texas has never held that a will's disposition of property is unnatural, and therefore indicative of undue influence, only if its proponent fails to provide a reasonable explanation for its devises. The *Rothermel* Court noted that a factfinder may not rely solely on the fact that a testator prefers one close relative over others as evidence of undue influence unless there is no reasonable explanation for the preference. *See id.* at 923–24. But it does not follow from this conclusion that the existence of a reasonable explanation for the testator's disposition of property bars a jury from finding that the will's disposition of property was unnatural based on other circumstances. For any explanation proffered, "the jury may pass upon its adequacy and attribute to the circumstance and its explanation such weight as may be thought proper, having in view all other relevant evidence." *Craycroft*, 285 S.W. at 279; *accord In re Estate of Johnson*, 340 S.W.3d 769, 783–84 (Tex. App.—San Antonio 2011, pet. denied). Fails offered his explanations to the jury, but the jury did not credit them.

Viewing the evidence in the light most favorable to the verdict, crediting evidence in its favor if a reasonable juror could, and disregarding contrary evidence unless a reasonable juror could not, we hold that the record contains legally sufficient proof from which the jury could have found un-

due influence. Accordingly, the probate court erred in disregarding the jury's affirmative finding of undue influence to Question No. 1.

### III. Sufficient evidence supports the jury's finding that Fails did not probate the 2011 will in good faith and with just cause.

#### A. Applicable Law

An executor who in good faith and with just cause tries to probate a will is entitled to recover his attorney's fees from the estate. TEX. EST. CODE § 352.052(a). The executor need not succeed in probating his proposed will to recover his fees, so long as he sought to probate it in good faith and with just cause. *Id.*

 Good faith ordinarily is a question of fact for the jury to decide based on the circumstances of the case, and we will uphold a jury finding that the party did not try to probate a will in good faith unless the evidence conclusively established the party's good faith. *Matter of Kam*, 484 S.W.3d 642, 654 (Tex. App.—El Paso 2016, pet. denied); *Ray v. McFarland*, 97 S.W.3d 728, 729–30 (Tex. App.—Fort Worth 2003, no pet.).

#### B. Analysis

 The charge defined "good faith" as "an action that is prompted by honesty of intention or a reasonable belief the action was probably correct." It defined "just cause" as meaning "that the actions were based on reasonable grounds and there was a fair and honest cause or reason for the actions."

After hearing disputed testimony from several witnesses that bore on Fails's honesty and motives in securing the execution of the 2011 will, the jury found that Fails did not try to have McGowan's 2011 will admitted to probate in good faith and with just cause. Because the proof was conflict-

ing, Fails did not conclusively prove his good faith and the issue was for the jury. The trial court therefore erred in disregarding the jury's finding to Question No. 2 that Fails did not seek to probate the 2011 will in good faith and with just cause and in implicitly finding that Fails acted in good faith and with just cause so as to be entitled to an award of fees for probating the 2011 will, contrary to the jury's findings to Question Nos. 2 and 3. *See Matter of Kam*, 484 S.W.3d at 654; *Ray*, 97 S.W.3d at 729–30.

### IV. Sufficient evidence supports the jury's finding that Fails tortiously interfered with Cox's inheritance, but not the corresponding damage award.

Yost contends that the trial court erred by disregarding the jury's findings in response to Question No. 6, in which it found that Fails tortiously interfered with Cox's inheritance, and Question No. 7, in which it found that Fails's interference caused Cox damages in the amount of $525,000.

#### A. Applicable Law

Texas courts of appeals are split on the question, but this court has recognized a cause of action for tortious interference with inheritance. *Compare King v. Acker*, 725 S.W.2d 750, 754 (Tex. App.—Houston [1st Dist.] 1987, no writ) ("We hold that a cause of action for tortious interference with inheritance rights exists in Texas."), *with Anderson v. Archer*, 490 S.W.3d 175, 176–78 (Tex. App.—Austin 2016, pet. filed) (refusing to recognize same cause of action). The trial court's charge instructed the jury that a party tortiously interferes with another's inheritance rights when he (1) participates in or receives benefits from a wrongful tortious act; (2) proximately causes an event which prevents or interferes with an inheritance of another person without just cause or excuse; and (3) results in damages or losses to that person.

Because neither side complains about the jury charge on appeal, we evaluate the legal sufficiency of the proof based on the charge as given. *See Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 407 (Tex. 2016); *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 254 (Tex. 2008).

A plaintiff who proves that another tortiously interfered with her inheritance rights may recover actual damages, both direct and consequential, that she suffered as a result of the interference. *King*, 725 S.W.2d at 756; *see also Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 117–18 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (direct damages "flow naturally and necessarily from" the wrong while consequential damages "result naturally, but not necessarily, from" the wrong and are recoverable "only if they are foreseeable and directly traceable to the wrongful act"). But she may recover only for an inheritance that she "would have received but for the tortious interference." RESTATEMENT (SECOND) OF TORTS § 774B cmt. d (1979); *e.g.*, *King*, 725 S.W.2d at 755–56 (affirming award of damages that would not have been incurred but for the interference). Thus, to recover damages for tortious interference with inheritance, the plaintiff must present some evidence that she "in fact stood to inherit or receive the property at issue" but for the interference. *Clark v. Wells Fargo Bank*, No. 01-08-00887-CV, 2010 WL 2306418, at *6 (Tex. App.—Houston [1st Dist.] June 10, 2010, no pet.) (mem. op.); *e.g.*, *Brandes v. Rice Tr., Inc.*, 966 S.W.2d 144, 149–50 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (claim disproven where proof established that plaintiffs did not have an expectancy to municipal bonds at issue under will).

### B. Analysis

We conclude that the evidence that supports the jury's finding of undue influence is also legally sufficient proof of tortious interference with inheritance. Undue influence is a kind of legal fraud, *see Rothermel*, 369 S.W.2d at 922; *Guthrie*, 934 S.W.2d at 833, and it therefore may serve as the predicate tortious act necessary to establish tortious interference with inheritance.

The jury heard evidence from which it reasonably could have found that Cox would have inherited under McGowan's 1979 will but for Fails's exertion of undue influence to bring about McGowan's execution of the 2011 will. For example, the jury had before it evidence from which it could have reasonably concluded that Cox would have inherited, under the 1979 will, a one-fourth interest in 155 acres of real property in Fayette County absent Fails's interference. The evidence also showed that Cox had survivorship rights in Chase Account 0374 and therefore stood to inherit the balance of that account had Fails not misappropriated McGowan's assets. This evidence is sufficient to support the jury's finding of tortious interference with inheritance. *See King*, 725 S.W.2d at 755–56 (expectancies lost due to tortious interference recoverable). The trial court therefore erred in disregarding the jury's answer to Question No. 6.

But the same is not true of the damages question, No. 7. The parties do not identify record evidence of the value of the real property in Fayette County that Cox stood to inherit under the 1979 will, and our search of the record reveals none. Instead, Yost's damages model was based on computing the total amount of money Fails misappropriated from various bank accounts owned by McGowan and from an annuity and life insurance policy. The fact that these assets would not necessarily pass under McGowan's will does not preclude Yost from recovering their value. *See*

RESTATEMENT (SECOND) OF TORTS § 774B cmt. b (1979) (tortious interference with inheritance and gift claims encompass any bequest made under a will, property that passes under an intestacy statute, and any other benefaction, including, for example, proceeds distributed under an insurance policy). But Yost bore the burden to adduce proof that, absent Fails's interference, these assets would have passed *to Cox. See Clark,* 2010 WL 2306418, at *6; *Brandes,* 966 S.W.2d at 149–50. As discussed below, Yost's damages proof does not support a conclusion that Cox would have inherited assets having a value of $525,000 absent Fails's interference.

We begin by noting that the amount awarded by the jury—$525,000—would not merely award Cox the amount she expected to inherit pre-interference, but would actually create a windfall in her favor. Fails made numerous transfers among McGowan's various bank accounts. Some were transfers *from* an account in which Cox held survivorship rights, i.e., Chase Account 0374, *to* an account in which she had no interest, i.e., Fails's personal checking account. Transfers of this kind reduced the amount of funds Cox would have inherited but for Fails's interference.

But Fails also made transfers of another sort—transfers in which he moved funds *from* accounts in which Cox had no expectation of inheritance, i.e, Omni Account 9951, *to* an account in which Cox held survivorship rights, i.e, Chase Account 0374. These transfers benefitted Yost at the expense of the person who held an interest in the account from which the transfers were made. Yost seeks the benefit of Fails's transfers to the extent they inflate her damages. She argues that transfers from an account in which she had no rights and into an account in which she held right of survivorship were arguably legitimate uses of Fails's power of attor-

ney, and that she ought to be permitted to recover for the damage she suffered when Fails later transferred the same funds from these accounts to himself. We disagree.

■ Longstanding precedent teaches that the proper measure of damages is one that puts the plaintiff in the position she would have occupied had the breach or tortious conduct not occurred. *See Reaugh v. McCollum Expl. Co.,* 139 Tex. 485, 163 S.W.2d 620, 621 (1942) ("The fundamental purpose underlying all rules of damages, other than punitive damages, is to indemnify the injured party for the pecuniary loss suffered by him, placing him as nearly as possible in the position that he would have occupied but for the injury in question."); *King,* 725 S.W.2d at 756 (reiterating that purpose of actual damages is "to repair the wrong that has been done"). With respect to Chase Account 0374, on which Cox was a signatory with survivorship rights, the evidence showed that Fails used the power of attorney to become a signatory on March 2, 2011, when the balance in the account exceeded $60,000. The account balance grew during 2011, partly as a result of Fails's transfer of $100,000 from another account owned by McGowan in which Moore, not Cox, held right of survivorship. The documentary evidence showed that between the date McGowan came to live with Fails until her death, Fails spent or transferred more than $260,000 from Chase Account 0374. The jury included all of this amount in its award. The jury reasonably could have disbelieved Fails's testimony that all of these expenditures were made for McGowan's benefit or with her approval, particularly because Fails transferred the lion's share of these funds to his own personal checking account. Yet, if the jury believed that Cox would have inherited the amount in Chase Account 0374 but for Fails's un-

authorized transfers from it, it cannot properly award Yost the $100,000 that Fails improperly transferred from Omni 9951 *to* Chase Account 0374 because, absent Fails's tortious conduct, this $100,000 would not have been held in Chase 0374, and Cox would not have expected to inherit it. In other words, the proper measure of damages required the jury to restore Yost to the position she would have occupied in the scenario in which Fails never misappropriated any of McGowan's funds. It does not permit Yost to benefit from Fails's tortious conduct to the extent it helps her at the expense of others.

The jury's $525,000 award cannot stand for another reason: it includes other amounts, aside from funds that passed through Chase Account 0374, despite the absence of evidence that Cox would have inherited the amounts absent interference by Fails. For example, the jury heard evidence that Fails transferred $250,000 out of McGowan's Omni Account 9951 and into a new Chase Account 5339, for later transfer to himself and the grandchildren of his girlfriend. The jury seemingly included this amount in its damage award, but the record contains no evidence that Cox would have inherited or otherwise received these funds absent Fails's interference. Indeed, the uncontroverted evidence shows that Moore and Fails had a right of survivorship in Omni Account 9951. Thus, with respect to Omni Account 9951, there was no evidence that any tortious interference by Fails damaged *Cox* as opposed to Moore.

Nor is there any evidence that Cox stood to benefit from the Jackson National Life Insurance Annuity or the Southern Financial Life Insurance Policy absent interference by Fails. Fails deposited the annuity's proceeds—$45,037.35—into Chase Account 5339 in May 2012, and subsequently transferred virtually all of these

funds into his own personal checking account the following month. But McGowan designated Moore and two others, Tina Sims and Frances Thorn, as the beneficiaries of the annuity. Thus, while the jury reasonably could have concluded that Fails misappropriated the annuity's proceeds, it could not have found that this misappropriation damaged Cox. In short, there was ample evidence that Fails tortiously interfered with Cox's inheritance rights, but the evidence does not permit a finding that Fails's conduct caused $525,000 in damages to Cox.

In her reply brief, Yost contends that the jury's damage award should stand because the jury reasonably could have found that Cox would have inherited $250,000 from McGowan's Chase Account 5539 but for Fails's interference. Yost reasons that any funds in Chase Account 5339—a joint account without a survivorship agreement—would have become part of McGowan's estate upon her death and passed to Cox as the sole beneficiary of McGowan's 1979 will had Fails not removed them. *See* TEX. EST. CODE §§ 113.151(a), 155 (sums in joint account belong to surviving parties if account includes written survivorship agreement and otherwise become part of decedent's estate). But Yost concedes that Fails transferred the $250,000 to Chase Account 5539 from McGowan's Omni Account 9951, in which Moore, not Cox, had a right of survivorship. As we noted above, Yost may not claim the benefit of what she claimed in the trial court was wholly improper conduct on the part of Fails. The jury was not permitted to include this $250,000 amount in its damage award because, absent Fails's improper conduct, it would have remained in Omni Account 9951, an account in which Cox had no expectation of inheritance.

 Yost further argues that the jury's damage award should stand because Fails

is equitably estopped from challenging the jury award or lacks standing to challenge it. But these contentions are untenable. As previously noted, Fails's tortious interference had to result in damages or loss to Cox in order to be compensable. *See Clark*, 2010 WL 2306418, at *6; *Brandes*, 966 S.W.2d at 149–50. Thus, damages or loss to Cox were an essential element of Yost's claim. *See King*, 725 S.W.2d at 754–57; RESTATEMENT (SECOND) OF TORTS § 774B cmt. d (1979). This likewise is consistent with the general rule that a plaintiff who does not represent the interests of others who also may have been injured by the defendant's wrongdoing may only recover her own damages. *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 739 (Tex. 1997). Yost solely represented Cox in the trial court and she therefore could only recover Cox's damages. Though we are sympathetic to the argument that Fails should not benefit from conduct the jury found to be wrongful, Yost may not recover damages or losses that someone other than Cox suffered as a result of Fails's wrongdoing. *See id.* Moreover, a suit for tortious interference with inheritance is not the lone procedure for challenging Fails's actions; the executor or administrator of McGowan's estate may seek recovery of misappropriated estate assets. TEX. EST. CODE § 351.054(a).

In sum, viewing the evidence in the light most favorable to the verdict, crediting evidence in its favor if a reasonable juror could, and disregarding contrary evidence unless a reasonable juror could not, we hold that the record contains legally sufficient proof that Fails tortiously interfered with Cox's inheritance. We further hold that, while there is some evidence of damages resulting from Fails's tortious interference with inheritance, there is not legally sufficient evidence of damages in the amount awarded by the jury. Accordingly, Yost's tortious interference claim must be tried anew. TEX. R. APP. P. 44.1(b); *Vega v. Fulcrum Energy*, 415 S.W.3d 481, 494 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

## Conclusion

We conclude that the trial court erred by:

(1) disregarding the jury's finding on Question No. 1 that McGowan's 2011 will resulted from undue influence;

(2) disregarding the jury's finding on Question No. 2 that Fails did not act in good faith and with just cause in seeking to probate McGowan's 2011 will;

(3) disregarding the jury's finding on Question No. 3 regarding attorney's fees, implicitly finding that Fails acted in good faith and with just cause, and awarding Fails his attorney's fees; and

(4) disregarding the jury's finding on Question No. 6 that Fails tortiously interfered with Cox's right to inherit property from McGowan.

Therefore, we affirm the portion of the trial court's judgment awarding Yost attorney's fees for trying to probate McGowan's 1979 will; reverse the remainder of the trial court's judgment; reinstate the jury's findings that McGowan signed her 2011 will as a result of undue influence and that Fails did not act in good faith and with just cause in trying to probate the 2011 will; and remand this cause to the probate court with instructions to conduct any further necessary probate proceedings and enter any further necessary orders consistent with this opinion and for a new trial on Yost's claim for tortious interference with Cox's inheritance rights.