**In the Matter of the ESTATE OF Stuart MONTGOMERY, Deceased.**

No. 12–92–00133–CV.

Court of Appeals of Texas, Tyler.

May 31, 1994.

Rehearing Denied July 28, 1994 and Aug. 31, 1994.

752

Mike Hatchell, Tyler, for appellant.

Robert M. Bandy, Tyler, for appellee.

RAMEY, Chief Justice.

The Appellant, LaVonne Montgomery ("LaVonne"), brings this appeal from a judgment refusing to admit a will of her late husband, Stuart Montgomery ("Stuart"), to probate. The lower court's refusal was based on a jury verdict that the will was not validly executed and was the product of undue influence, as contended by Appellee, Dana Ann Spruiell ("Dana"), Stuart's daughter. We will reverse and render the judgment with respect to the will's proper execution, and remand for a new trial on the issue of undue influence.

Stuart married the former LaVonne Russell in January, 1991. They met the previous year, and were engaged in October, 1990. Both had been previously married, had children from their previous marriages, and had survived the death of their first spouses.

Stuart had two children during his first marriage, Dana and Sandra. Sandra died many years before Stuart met LaVonne, but was survived by a son, Brent Tidwell.

The record contains two wills executed by Stuart. In the first, executed on March 23, 1989, Stuart left his entire estate to his daughter Dana. The second will, executed on May 14, 1991,[1] left everything to Stuart's wife, LaVonne, with the exception of his real property, which was devised to Dana "subject only to my said wife's possessory homestead interest therein;" this second will was the one which LaVonne sought to admit to probate below, and which Dana successfully contested.

In the first special issue, the jury found that "the Last Will and Testament of Stuart Montgomery dated May 14, 1991" was not "executed with the formalities and solemnities and under the circumstances required by law to make it a valid Will." LaVonne's first point of error asserts that the trial court erred in overruling LaVonne's motion for judgment notwithstanding the verdict, because the evidence conclusively established that the May 14 will was validly executed, and because there was no evidence of undue influence. Her second point of error maintains that, even if there were some evidence to support the challenged jury findings, such findings were against the great weight and preponderance of the evidence.

As the party with the burden of proof on whether the will was validly executed, LaVonne must demonstrate that the evidence conclusively established all essential facts in support of the issue. We determine whether this has been accomplished by first examining the record for evidence that supports the jury finding, ignoring all evidence to the contrary. Then, if no evidence supports the challenged finding, the entire record must be examined to determine if the contrary proposition is established as a matter of law. *Barrett v. U.S. Brass Corp.*, 864 S.W.2d 606, 626–27 (Tex.App.—Houston [1st Dist.] 1993, writ granted).

1. Another will dated May 7, 1991, similar to the May 14 will, was prepared, but does not appear in this record.

■ The contested will was unquestionably drawn and executed in conformity with the requirements of Sec. 59, TEX.PROB.CODE ANN., which provides that

> Every last will and testament, except where otherwise provided by law, shall be in writing and signed by the testator in person or by another person for him by his direction and in his presence, and shall, if not wholly in the handwriting of the testator, be attested by two or more credible witnesses above the age of fourteen years who shall subscribe their names thereto in their own handwriting in the presence of the testator.

Dana stipulated, in the course of the trial, that the will in question was signed by Stuart and that Stuart had full testamentary capacity on the day he signed it. The witnesses to the will testified without contradiction that they personally observed Stuart sign the will. There was no evidence supporting the finding that the will was not validly drawn, executed, and witnessed.

Dana argues that the will introduced into evidence is not the will as drawn, signed, and witnessed, because Stuart, sometime between the time the will was executed and his death, heavily obliterated one or more lines in the will by marking through them. The testimony of the attorney who drafted the will established that the obliterated language purported to invalidate a pre-nuptial agreement between Stuart and LaVonne, entered into prior to the marriage; likewise there is no dispute that such language in the will was known to Stuart to be inoperative to accomplish what it purported to do as testified by the attorney.

■ Dana contends that the will offered into evidence was not the will witnessed, since the will, when executed and witnessed, had no passages marked out.[2] But the jury issue was whether, on May 14, such will was "executed with the formalities and solemnities and under the circumstances required by law to make it a valid will." There was no

inquiry of the jury about the validity of the attempt to eliminate the obliterated passage. The will's execution was a particular event that occurred at a specific time. The subsequent obliteration of a portion of the will was an independent act which occurred at a different time. The jury issue only asked about the actual act of executing the will. As stated, there was no evidence supporting the finding that the will's execution did not comply with the requirements of Section 59 of the TEXAS PROBATE CODE.

■ Finally, Dana argues that LaVonne should have made a specific offer of the May 14 will into evidence as originally drafted, prior to the obliteration. No cases were cited to support this contention. We hold that there was no reversible error in offering the May 14 will in the condition that it existed when Stuart died; if improper, there was no objection to the offer. The language of the offer of the will did not affect the special issue directly inquiring as to the will's compliance with the requirements of Section 59 when executed on May 14.

Not only does the record contain no evidence supporting the jury's finding, the entire record conclusively establishes the contrary proposition. LaVonne's first point of error with respect to the first jury issue is sustained.

■ LaVonne additionally contends in her first point of error that the lower court erred in failing to grant her motion for judgment notwithstanding the verdict, because there was no evidence supporting the jury's finding on the second jury issue, that the will was the product of undue influence. A court reviewing a failure to grant a motion for judgment notwithstanding the verdict must examine the evidence in the light most favorable to the jury's findings, considering only the evidence and the inferences that support the verdict and rejecting any contrary evidence and inferences. *Multi–Moto v. ITT Commercial Finance,* 806 S.W.2d 560, 565 (Tex.App.—Dallas 1990, writ denied). The

---

2. The only case authority cited by Dana was *Pullen v. Russ,* 209 S.W.2d 630 (Tex.Civ.App.—Amarillo 1948, writ ref'd n.r.e.). The *Pullen* case considers whether effect can be given to subsequent informal modifications of the will. It does not stand for the proposition that the proffered will as originally drafted should not be admitted to probate. *Pullen* only holds that defective subsequent changes in the will are invalid and the will can be probated as originally written.

failure to grant such motion will be found erroneous only if no more than a scintilla of evidence in the record supports the disputed jury findings. *Wal–Mart Stores, Inc. v. Hinojosa*, 827 S.W.2d 43, 44–45 (Tex.App.—Corpus Christi 1992, no writ).

■ A will may be set aside on the grounds of undue influence only if the contestant proves:

1) the existence and exertion of an influence,

2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament, and

3) the execution of a testament which the maker thereof would not have executed but for such influence.

*Watson v. Dingler*, 831 S.W.2d 834, 837 (Tex. App.—Houston [14th Dist.] 1992, writ denied).

■ Since there is seldom direct evidence of undue influence, it may be proven by circumstantial evidence. *Gaines v. Frawley*, 739 S.W.2d 950, 952 (Tex.App.—Fort Worth 1987, no writ). Among the factors typically considered are

evidence of infirmity of mind produced by age, ill health, circumstances attending the execution, opportunity for the exercise of influence that would destroy the exercise of free agency, and an unnatural or unjust disposition by the instrument.

*In re Estate of Riley*, 824 S.W.2d 305, 306 (Tex.App.—Corpus Christi 1992, writ den.). But

[w]hen circumstantial evidence is relied upon [to establish undue influence], the circumstances must be so strong and convincing and of such probative force as to lead a well-guarded mind to a reasonable conclusion not only that undue influence was exercised but that it controlled the will power of the testator at the precise time the will was executed.

*Green v. Earnest*, 840 S.W.2d 119, 121 (Tex. App.—El Paso 1992, writ denied). A finding of undue influence may not rest solely on circumstantial evidence which is equally consistent with the absence of undue influence. *Smallwood v. Jones*, 794 S.W.2d 114, 118 (Tex.App.—San Antonio 1990, no writ). Nor will evidence of pressure by the beneficiary or mental confusion on the part of the testator amount to evidence of undue influence unless they establish that the free agency of the testator was destroyed. *Ibid.* Similarly, circumstances which merely raise a surmise or suspicion of undue influence will not be sufficient to support such a finding. *Green v. Earnest*, 840 S.W.2d at 123.

These standards, and the cases applying them, require evidence beyond that of mere influence or persuasion to establish undue influence. The degree of pressure asserted, as noted above, must be such that it subverts or overpowers the mind of the testator at the time of the execution of the testament.

An example of outside pressure sufficient to subvert or overpower the mind of the testator at the time of the execution of the testament is found in *Watson v. Dingler*, 831 S.W.2d 834 (Tex.App.—Houston [14th Dist.] 1992, writ denied). There the physically and mentally feeble testator, a week before his death, changed his will in favor of a beneficiary who kept him up an entire night pressuring him to make the desired changes. A similar scenario was presented in *In re Estate of Riley*, 824 S.W.2d 305 (Tex.App.—Corpus Christi 1992, writ denied). The testator in *Riley*, immediately before heart surgery, was induced to execute a new will totally disinheriting his children. The beneficiary not only gave the testator a will form allowing only a single beneficiary; she also falsely assured him that the instrument gave her only a life interest in his estate.

By way of contrast, the court in *Smallwood*, 794 S.W.2d at 118, found that the trial court properly disregarded a jury's finding of undue influence in a case in which the contestant, the testatrix's son, received only a fifth of an estate, the remainder of which went to the testatrix's sister. The will had been made three weeks after the testatrix had had to move in with her sister, who then arranged for the testatrix to make a new will. The sister was present in the lawyer's office when the new will was executed, and, though she was having financial difficulties at the time, and had clearly influenced the testatrix

to change certain personal habits, this evidence was deemed "no more than a scintilla of evidence of undue influence." *Ibid,* at 118. The contestant's evidence was consistent with the execution of a will free from undue influence.

Dana asserts that the evidence for such undue influence, considering only the evidence and the inferences that support the verdict, and rejecting any contrary evidence and inferences, may be summarized as follows: LaVonne initiated the relationship with Stuart, a sixty-eight year old, recently widowed man who was despondent over his first wife's death. There was evidence that Stuart was a "passive" individual who sought to please and tended to go out of his way to avoid conflict. LaVonne moved in with Stuart before they were married, and LaVonne, shortly before their marriage, became a joint tenant with right of survivorship on Stuart's checking account, as well as the beneficiary on certain life insurance policies.

After their marriage in Las Vegas, LaVonne began influencing Stuart's personal and social life. She had him take dancing lessons, which he disliked, and caused him to initiate a regimen of exercise and vitamins. He consulted with his physician about sexual dysfunction. LaVonne's disapproval of Stuart's smoking and drinking forced him to enjoy these habits only furtively. He placed some family jewelry in a safe deposit box without her knowledge. Though not a particularly religious man, Stuart began attending LaVonne's church, which would have denied him formal membership because of his belonging to a fraternal order requiring secret oaths. After his marriage, Stuart saw less of his family and old friends. He did not enjoy traveling as much as LaVonne, but went along with her wishes.

LaVonne had expressed a desire to remain in the house they were sharing in the event that Stuart died first; shortly after the marriage she had sold her own home to her son. Stuart and LaVonne's pre-nuptial agreement provided that LaVonne's right to remain on the property would terminate if she remarried or if another male lived with her on the property "on any regular basis." Stuart showed the will to LaVonne the evening that he executed it; between that evening and his death, someone crossed out such purported revocation, to the extent that it became impossible to ascertain what had been originally written from the document alone. As noted above, the will offered for probate devised only a remainder in Stuart's real property to Dana.

On the day of Stuart's death, LaVonne signed over to herself a number of vehicle titles that had been executed in blank. She was perceived to have made the funeral arrangements without regard to the wishes of his immediate family, and also changed the locks on the house. And, at the time of trial, she had not visited the cemetery where Stuart had been buried.

Furthermore, there were three revisions from the 1989 will that Stuart made in his 1991 wills. First, Stuart instructed his attorney, Jay Mills, to substitute Mike Lofties, LaVonne's son-in-law, for Glenn Gray, Stuart's long-time friend, as the executor of his estate. There was no explanation in the record for this change other than LaVonne's wishes; it appears that Stuart's choice of executor was influenced by LaVonne's preference in this respect.

Second, on May 14, only seven days after having a prior will prepared, Stuart's will was re-written for the sole purpose of bequeathing Stuart's Mobil stock to LaVonne rather than Dana. The record is silent as to any event that transpired during that week or any other explanation to prompt this apparently significant change in Stuart's testamentary wishes, which benefitted LaVonne. These circumstances suggest that the beneficiary of the change, LaVonne, sought this amendment.

Third, the inclusion of the provision in both May wills attempting to revoke the pre-nuptial agreement circumstantially reflected LaVonne's overriding influence. Stuart's insistence upon the provision, despite his attorney's assurance that it could have no effect, suggests that LaVonne's desire for its inclusion overrode Stuart's understanding of the law and the effect of the provision. We hold that there is somewhat more than a scintilla of evidence supporting the jury's finding that

the challenged will was the product of La-Vonne's undue influence.

■■■■■ In her second point of error La-Vonne asserts that the evidence was factually insufficient to support the jury's finding that the will was a product of undue influence. In considering a point of error challenging the factual sufficiency of the evidence supporting a finding, a reviewing court must consider and review all the evidence in the case, and, if the challenge is made, as here, by the party which did not have the burden of proof on the disputed issue, the finding may be set aside only if the evidence is so weak as to be clearly wrong and manifestly unjust. *Berry Property Management v. Bliskey,* 850 S.W.2d 644, 656 (Tex.App.—Corpus Christi 1993, writ dism'd by agr.). Having fully reviewed the record in this case we conclude that the evidence was factually insufficient to support the jury's finding of undue influence.

Though we concluded that the record did contain something more than a scintilla of evidence supporting the finding of undue influence when only the evidence supporting the finding was considered, our broader review of all the evidence convinces us that the jury's finding was clearly wrong and manifestly unjust. The undisputed evidence established that Stuart, at almost seventy, was in good health, in mind and in body. His claimed "passivity" was not the result of age or infirmity, but was a character trait of many years' standing. There was no evidence that his will was in a weakened condition or that he had any special susceptibility to outside pressure at the time that the questioned instrument was drafted. There was no evidence that Stuart's death was anything other than an accident, and the projects and plans that he was involved with at the time of his death belie the notion that he was not a normal and healthy man for an individual of his age.[3]

Neither was there evidence that LaVonne discussed or expressed her desires as to the contents of the will with Stuart preceding his having it drawn. The only evidence of Stuart's testamentary desires apart from the testimony surrounding the preparation and execution of the will itself was Glenn Gray's testimony of a conversation with Stuart during the preceding March or April. Gray, a witness for the contestant, Dana, testified that Stuart told him that he was going to change his will, because he "just needs to see that LaVonne is going to be protected ..."

The drafting attorney, Jay Mills, who had no relationship with and did not know La-Vonne, testified that Stuart had been his client for a number of years prior to the preparation of the questioned will. Mills stated that on the day that the May 14 will was drafted, Stuart came by himself for the appointment. He said that Stuart was emphatic and clear in this discussion. He exhibited no nervous mannerisms. He said that in his opinion Stuart knew what he was doing and what he wanted to do with his estate. According to Mills, Stuart was a strong-willed person and his mind was sound. In these conversations Stuart did not mention LaVonne's name other than to assert that she should have his entire estate except for the real estate.

Likewise, the notary and the witnesses to the execution of the May 14 will testified that LaVonne was not present nor was her name mentioned when the will was executed. From their limited observation of the testator, they were of the opinion that Stuart was mentally alert. Even if Stuart's later obliteration of a sentence from the will (if that was, indeed, his act) suggests a desire then to eliminate a provision which was itself of no effect. If anything, it demonstrates that Stuart had no dissatisfaction with all the remaining, operative provisions of the will.

■■■■ With respect to the alleged "unnatural disposition" of Stuart's property, Dana was not entirely eliminated from the will; she received Stuart's greatest single asset, his real property, subject to the pre-existing and independent rights which LaVonne had in the property. Dana had already received various significant financial contributions

---

**3.** Dana's blanket testimony that Lavonne influenced Stuart against his will is not probative of the issue, since "[w]hether a beneficiary under a will exerted undue influence ... is a question of ultimate fact for the jury," and "opinions and beliefs on the subject of undue influence are not evidence of probative force." *Green v. Earnest,* 840 S.W.2d at 123.

from her father at the time that the testament was drafted, and it was no secret that he did not approve of her personal relationship with a third party at that time. As to the grandson not being included in the will, the evidence shows that he, likewise, received nothing in any of Stuart's prior wills.

It is not unusual that a husband leave the lion's share of his estate to his wife. It would be quite surprising if a man's behavior did not change in many respects after marriage. And tension between a spouse taken late in life and one's children is not abnormal. Because we find that the evidence supporting the finding that the will was a product of undue influence was factually insufficient, we sustain LaVonne's second point of error, with respect to the finding of undue influence.

The judgment of the court below is reversed. With respect to the contested issue of the will's execution, we render a judgment that the will was executed with the requisite formalities to constitute it a valid will. With respect to the disputed issue of whether the will was a product of undue influence, we remand the cause to the trial court for a new trial on such contested issue.