**Reversed and Remanded and Memorandum Opinion filed March 10, 2022.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-20-00575-CV

_____

## IN THE ESTATE OF MANUELA MESA CASAS, DECEASED

**On Appeal from the Probate Court No. 3**
**Harris County, Texas**
**Trial Court Cause No. 468899**

## M E M O R A N D U M   O P I N I O N

Rebecca Ayala appeals from the probate court's judgment sustaining a will contest. The court refused to admit the will of Rebecca's mother to probate and issued two findings at issue on appeal: (1) the will was a product of undue influence; and (2) the decedent's primary language was Spanish and she had difficulty understanding spoken and written English. Rebecca challenges both findings on legal and factual insufficiency grounds.

We hold that the trial court did not err in finding that the decedent's primary language was Spanish. However, upon a thorough review of the entire record, we conclude the trial court's finding that the will was a product of undue influence is

not supported by factually sufficient evidence. We reverse and remand the case to the trial court.

## Background

Manuela Casas executed a Last Will and Testament on July 28, 2010 (the "2010 Will"). The will specifically devised three cemetery plots, all contents of Manuela's household, and all her jewelry to her daughter Concepcion, unless Concepcion predeceased Manuela, in which event those devises would go to Manuela's daughter Mary Helen. The will divided the remainder of Manuela's estate equally between her eight living children—Mary Helen, Delores, Concepcion, David ("Junior"), Herlinda, Rebecca, Hazel, and Ray.[1] Concepcion, who helped her mother execute the will, did not tell her other siblings about the 2010 Will, at her mother's request.

In early 2011, Manuela learned that she no longer owned her home. Manuela had, apparently unwittingly, signed a document conveying her house to her son Junior. When Manuela discovered what happened, she was very upset. Concepcion and Ray handled the issue and successfully re-established ownership of the house in Manuela's name.

In June 2011, Manuela broke her hip and required surgery. A few months later, Manuela began living at Rebecca's house. Manuela was ambulatory with the use of a walker. Rebecca took care of Manuela's basic daily needs, such as cooking and bathing.

Manuela changed her will in October 2011, disinheriting two of her children, Junior and Hazel. She also devised one cemetery plot to Mary Helen and the remainder of her estate to her children equally, with the exception of Mary Helen,

---

[1] Manuela's two other children died prior to the events of this appeal.

2

Junior, and Hazel. Rosalind Curtis, an attorney, prepared the 2011 will for Manuela. Curtis previously provided legal services for Ray.

In June 2012, Rebecca took Manuela to open a bank account in Manuela's name, designating Rebecca as a secondary joint owner. Rebecca routed Manuela's Social Security check to this bank account. In October 2012, Manuela executed a medical power of attorney, naming Rebecca as attorney. In November 2012, Manuela suffered a stroke.

In 2013, Manuela engaged Curtis to change her will again. Ray made the appointment with Curtis and took Manuela to Curtis's office. The 2013 will still disinherited Hazel and Junior, but also added Allen Casas, the son of one of Manuela's deceased children, as a beneficiary. The same day, Manuela signed a power of attorney, making Ray and Rebecca her primary and secondary agents, respectively.

Manuela changed her will yet again in September 2014 (the "2014 Will"), naming Rebecca as the sole beneficiary of Manuela's estate. As she had for the 2011 and 2013 wills, Curtis prepared the 2014 Will.

Manuela was admitted to the hospital in December 2014. After she was discharged, Manuela signed a power of attorney to allow Rebecca to sell Manuela's house. Curtis prepared the power of attorney. Manuela sold her house to a company owned by Rebecca's daughter.

Manuela died on October 12, 2016.

Rebecca initially did not apply to probate the 2014 Will. She asked Curtis if she needed to probate the will, and Curtis said "no" because no assets (i.e., Manuela's house) remained.

3

On August 14, 2018, the probate court admitted the 2010 Will to probate on Concepcion's application. On November 16, 2018, Rebecca filed a Contest to Probate of Will and Application for Probate of New Will and Issuance of Letters Testamentary. In her contest, Rebecca alleged the 2014 Will revoked the 2010 Will, and she applied to probate a copy of the 2014 Will. Concepcion contested the 2014 Will on the ground of undue influence.

After a bench trial, the probate court ruled for Concepcion and signed findings of fact. Relevant here, the court found that Manuela signed the 2014 Will as a result of undue influence and, therefore, the 2014 Will did not revoke the 2010 Will. The court refused to admit the 2014 Will to probate. The court also found that Manuela's "primary language was Spanish and she had difficulty understanding spoken and written English."

Rebecca appeals.

### Standards of Review

Rebecca raises both legal and factual sufficiency challenges. The present findings resulted from a bench trial, but our sufficiency review of court findings does not differ substantively from that applicable to jury findings. *See MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009); *Arshad v. Am. Express Bank, FSB*, 580 S.W.3d 798, 803 (Tex. App.—Houston [14th Dist.] 2019, no pet.). In reviewing the legal sufficiency of the evidence, we consider the proof in the light most favorable to the finding, crediting evidence in its favor if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The proof is legally insufficient if: there is no proof of a vital fact; rules of law or evidence bar the court from giving any weight to the only proof of a vital fact; the proof supporting a vital fact is no more than a scintilla of

4

evidence; or the proof conclusively shows the opposite of a vital fact to be true. *See Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015).

When a party challenges the factual sufficiency of the evidence supporting a finding for which she did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 769 (Tex. App.—Houston [14th Dist.] 2004, no pet.). In performing our review, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Ellis*, 971 S.W.2d at 406-07; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming the judgment. *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

This court is not a factfinder. *Ellis*, 971 S.W.2d at 407. Instead, the trier of fact, in this case the trial court, is the sole judge of the credibility of the witnesses and the weight to afford their testimony. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Therefore, we may not pass upon the witnesses' credibility or substitute our judgment for that of the trial court, even if the evidence would also support a different result. *Id.*

**Analysis**

**A.**     **The trial court's findings regarding Manuela's primary language are supported by legally and factually sufficient evidence.**

In her first issue, Rebecca challenges the legal and factual sufficiency of the evidence supporting the trial court findings that Manuela's primary language was Spanish and that she had difficulty understanding spoken and written English.

Viewing the evidence in the light most favorable to the findings, crediting evidence in its favor if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not, we conclude legally sufficient evidence supports the challenged findings. *See City of Keller*, 168 S.W.3d at 827. Concepcion recalled a time when Manuela "didn't even speak English . . . she would understand, but she would speak back to us in Spanish." Similarly, Curtis testified that she had her paralegal read the 2014 Will to Manuela in Spanish, which gives rise to a reasonable inference that Manuela may not have otherwise fully understood the document in English. Therefore, there is more than a scintilla of evidence to support the trial court's finding.

Rebecca disputed that Manuela exclusively or primarily spoke and understood Spanish and not English. However, in view of the entire record, we conclude the disputed evidence is not so significant that the trial court's findings are against the great weight and preponderance of the evidence.

We overrule Rebecca's first issue.

**B.**     **The trial court's undue influence finding is not supported by factually sufficient evidence.**

In her second issue, Rebecca argues that the trial court's finding that the will was a product of undue influence is not supported by legally sufficient evidence

6

and is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[2]

    1.    Law regarding undue influence

Undue influence is a ground for setting aside a will. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). A will contest based on a claim that the will was procured by undue influence has three elements: (1) an influence existed and was exerted; (2) the exertion of the influence subverted or overpowered the mind of the testator at the time she signed the will; and (3) the testator would not have made the will but for the influence. *See In re Estate of Woods*, 542 S.W.2d 845, 847 (Tex. 1976); *Rothermel*, 369 S.W.2d at 922; *In re Estate of Ayala*, No. 14-14-00324-CV, 2015 WL 4930638, at *5 (Tex. App.—Houston [14th Dist.] Aug. 18, 2015, pet. denied) (mem. op.). The burden to prove undue influence normally rests on the party challenging the instrument's validity. *Quiroga v. Manelli*, No. 01-09-00315-CV, 2011 WL 944399, at *5 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op.).

To satisfy the first element, the will contestant must show that an influence existed and was exerted. *Rothermel*, 369 S.W.2d at 922. Relevant factors include: (1) the nature and type of relationship existing between the testator, the contestant, and the party accused of exerting such influence; (2) the opportunities for the exertion of the alleged influence; (3) the circumstances surrounding the drafting and execution of the will; (4) the existence of a fraudulent motive; and (5) whether the testator was habitually under the control of another. *Id.* at 923. The exertion of

---

[2] Rebecca's statement of her second issue is limited to a factual sufficiency challenge. However, her brief's substantive argument includes several references to the complete absence of evidence as to certain elements or factors. We therefore construe Rebecca's brief liberally as challenging the undue influence finding on both legal and factual sufficiency grounds. *See Zewde v. Abadi*, 529 S.W.3d 189, 192 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

7

influence, however, cannot be inferred from opportunity alone, such as might result from caring for the testator or seeing to her needs. *Id.* There must be proof showing both that the influence existed and that it was exerted. *Id.*; *Estate of Ayala*, 2015 WL 4930638, at \*5; *Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied).

To satisfy the second element, the contestant must show that the exertion of the influence subverted or overpowered the mind of the testator at the time she signed the will. *Rothermel*, 369 S.W.2d at 922. On this element, relevant considerations include: (1) the testator's state of mind and evidence relating to her ability to resist or susceptibility to the influence of another, such as mental or physical infirmity or incapacity, when the testament was executed; and (2) the testator's words and acts. *Id.* at 923. But evidence that a testator was susceptible to influence or incapable of resisting it does not prove that her free will was in fact overcome when the testament was made. *Id.*; *see also Guthrie v. Suiter*, 934 S.W.2d 820, 832 (Tex. App.—Houston [1st Dist.] 1996, no writ). Influence is undue only if the volition of the testator is destroyed and the resulting will expresses the wishes of the one exerting the influence. *Rothermel*, 369 S.W.2d at 922. Such undue influence may include force, intimidation, duress, excessive importunity, or deceit. *Id.* If the relevant conduct is not so excessive as to actually subvert the testator's will, however, it will not taint the instrument's validity. *Id*. Likewise, close relations or the provision of care standing alone do not suffice to show undue influence. *See, e.g.*, *Guthrie*, 934 S.W.2d at 832; *Evans v. May*, 923 S.W.2d 712, 715 (Tex. App.—Houston [1st Dist.] 1996, writ denied).

To meet the third element, the contestant must show that the testator would not have made the challenged will but for the influence. *Rothermel*, 369 S.W.2d at 922. In general, this element focuses on whether the will is unnatural in its

disposition of property. *Id.* at 923. A disposition may be unnatural, for example, if it excludes a testator's natural heirs or favors one heir at the expense of others who ordinarily would receive equal treatment. *See Long v. Long*, 125 S.W.2d 1034, 1036 (Tex. 1939). Whether a particular disposition is unnatural, however, usually is for the factfinder to decide based on the circumstances. *See Craycroft v. Crawford*, 285 S.W. 275, 278-79 (Tex. 1926). The disinheritance of close relatives or loved ones is not necessarily an unnatural disposition. *See, e.g.*, *Guthrie*, 934 S.W.2d at 832 (exclusion of testator's only living son from will not unnatural given strained and distant relationship between him and his mother). But a testator's preference for one heir over others of an equal or similar degree of kinship may be unnatural if the record does not disclose a reasonable basis for the preference or contains proof that calls the preference into question or discredits it. *See Rothermel*, 369 S.W.2d at 923-24; *Curry v. Curry*, 270 S.W.2d 208, 213 (Tex. 1954); *Craycroft*, 285 S.W. at 278-79.

Undue influence may be established by circumstantial evidence, but the circumstances must be of "a reasonably satisfactory and convincing character," and "not be equally consistent with the absence of the exercise of such influence." *Rothermel*, 369 S.W.2d at 922-23. Texas respects the legal rights of testators of sound mind to dispose of their property as they see fit; those desires should not be set aside based upon a mere surmise or suspicion of wrongdoing. *Id.*; *Reynolds v. Park*, 485 S.W.2d 807, 813 (Tex. App.—Amarillo 1972, writ ref'd n.r.e.).

2. Whether Rebecca exerted an influence that overcame Manuela's mind at the time of the 2014 Will's execution

a. *Legal sufficiency discussion*

Turning to Rebecca's legal sufficiency argument, we consider the proof in the light most favorable to the finding, crediting evidence in its favor if a

reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *See City of Keller*, 168 S.W.3d at 827. Applying this standard, the record reveals at least an opportunity for Rebecca to influence how Manuela may have decided to dispose of her property. Manuela lived with Rebecca and relied on her (and other relatives) for daily needs from late 2011 to the time of the 2014 Will's execution and afterward. Before Manuela moved in with Rebecca, all of Manuela's children collectively assisted with her care. But, according to one witness, Rebecca stopped sharing information about Manuela with her siblings sometime after 2011. While living with Rebecca, Manuela always wanted to be with Rebecca and became anxious when Rebecca would leave the room. After Concepcion and Ray helped Manuela re-establish home ownership following the incident with Junior, Rebecca assisted Manuela in opening a new bank account, for which Rebecca was a co-signer. In 2013, Manuela executed a medical power of attorney and general durable power of attorney designating Rebecca and her brother, Ray, as attorneys-in-fact. Prior to signing the 2014 Will, Manuela met with Curtis to discuss the changes she wanted to make. About a week later, Manuela returned to sign the will. Rebecca transported Manuela, who did not know how to drive, to Curtis's office for both meetings. Rebecca was present at the 2014 Will's signing and discussed the will's contents with Manuela beforehand. Based on these facts alone, Rebecca had an opportunity to influence Manuela's decision to change her will in 2014, including the potential new will's property disposition.

An undue influence finding, however, cannot rest on the mere opportunity to exercise influence. *Rothermel*, 369 S.W.2d at 923. Thus, we consider whether evidence exists that Rebecca actually exerted an influence when she had the opportunity to do so that subverted Manuela's mind.

10

According to Concepcion, Manuela was susceptible to influences because of a deteriorating mental condition as early as 2011. For instance, Manuela's niece Maria Louisa testified that even before the fall of 2011, Manuela would ask "Well, who are you?" to her children or grandchildren. Manuela's grandson Allen testified that she would sometimes refer to Allen by his deceased father's name or simply call him "mijo," which is a colloquial way of saying "my boy" or "my son" in Spanish. Allen also testified that Manuela would repeat a certain phrase over and over.[3] Concepcion testified that she took her mother to visit Manuela's husband's grave in 2013 and Manuela did not know why they were going there, even though they made the trip regularly. Manuela also did not recognize family members at a 2013 funeral and, according to Concepcion, Manuela started "rapidly declining" after that funeral. Manuela's granddaughters Leslie and Gloria took Manuela to lunch in late 2013. Rebecca had warned them that Manuela was acting confused that day. At lunch, Manuela was confused and afraid and did not recognize Leslie or Gloria. Also, in May 2014, Manuela did not recognize her surroundings while on a trip with her daughters Herlinda and Concepcion to a casino she had visited many times. The medical records from Manuela's December 2014 hospitalization reference a "history of dementia."

Concepcion asserts that Manuela would forget she was speaking with her brother on the phone. Manuela's brother Gilbert testified that Manuela would ask "Who is this" when he called, and "then [he] could hear Becky [Rebecca] in the background, That's your little brother, Beto." Gilbert testified that, when Manuela needed to be reminded to whom she was speaking, it was "fairly close to when she passed away" in 2016.

_____

[3] The trial court sustained a hearsay objection, so the nature or content of the phrase is not in our record, but Allen testified that he asked Rebecca "what [Manuela] actually meant by it, and [Rebecca] gave [him] an explanation, and then [he] understood."

11

As to whether Rebecca actually exerted an influence over Manuela, the record contains scant evidence. There was no testimony that Rebecca ever asked or urged Manuela to change her will to favor Rebecca alone. Concepcion's argument that Rebecca exerted an undue influence is based on two circumstantial facts. The first is Rebecca's presence at the 2014 Will signing. According to Concepcion, Rebecca exerted an undue influence by reassuring Manuela that it was okay to sign the will.[4] Rebecca was not the only family member present, however, and to the extent Rebecca reassured Manuela that it was okay to sign, she might have done so for reasons not indicative of undue influence. For instance, she may have reassured her mother that it was okay to sign because the will had been drafted by a lawyer in accordance with Manuela's instructions, rather than because Rebecca simply wanted to benefit from the will. This evidence is insufficient of undue influence because it is "equally consistent with the absence of the exercise of such influence." *Rothermel*, 369 S.W.2d at 922. Likewise, merely being present at a will signing is not evidence of undue influence. *In re Estate of Parrimore*, No. 14-14-00820-CV, 2016 WL 750293, at *9 (Tex. App.—Houston [14th Dist.] Feb. 25, 2016, no pet.) (mem. op.) ("Although Patrice was present for

---

[4] Rebecca testified, "[i]f mother had any questions -- I mean, we always reassured mom, you know, when she was going to sign something, she would look at us so we could reassure it was okay to sign it."

Ray testified similarly regarding previous will signings:

> Q. Okay. But do you remember that you spoke to your mom and let her know that you had read it and everything was okay?

> A. The best of my recollection, when we went to pick up the will, Ms. Curtis would come out with the will, and I would ask -- I would reach, can I? Can I? And my mom would give it to me, and I would scan it and review it, and then I would give it back to my mom.

> Q. So certainly your mother could see that you were reviewing the will before she signed it, correct?

> A. Yes, that was her hope.

12

the will signing and indeed signed the will on Melvin's behalf, these facts in and of themselves are not evidence of undue influence.").

Second, Concepcion points to evidence she construes as an attempt by Rebecca to deceive Manuela. Specifically, Concepcion and Herlinda recalled occasions when they heard Rebecca tell Manuela that Rebecca was the only one among the children who loved and cared about her.[5] The record does not reveal, however, when or how often those statements were made. We see no other evidence suggesting that Rebecca used force, intimidation, duress, or excessive importunity in any of her interactions with Manuela with respect to the 2014 Will. *See Rothermel*, 369 S.W.2d at 922.

Concepcion may rely on circumstances alone, but to support an undue influence finding the evidence must be of a "reasonably satisfactory and convincing character." *Id.* The record contains evidence relating to at least some factors on the first and second elements. In particular, Rebecca, as a caregiver, no doubt had opportunities to exert influence over many aspects of Manuela's daily life, and Concepcion presented much testimony that Manuela was experiencing declining mental health from 2011 forward. However, it is questionable whether

---

[5] Concepcion:

> Q. What were the comments that she was making in front of your mother?
>
> A. Mom, see, they never come around. I'm the only one that loves you. I'm the only one that cares for you. You know, they didn't even bother with you. And that kind of started some things.
>
> Q. Who was with you at this time, was it just you and Becky?
>
> A. No, it was my oldest sister, Mary Helen.

Herlinda: "And what I didn't like is, you know, Becky would say, You see, mom, I'm the only one that takes care of you and I'm the only one that loves you. And I would say, you know, mother, that's not true. All your daughters love you, mother. Don't be listening."

13

the present record contains sufficiently convincing evidence to survive a legal sufficiency challenge that Rebecca actually exerted an undue influence.

We will presume the evidence pertaining to the first and second elements is legally sufficient. We conclude nonetheless that the undue influence finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Ellis*, 971 S.W.2d at 407. We therefore detail further evidence below and state in what regard the contrary evidence greatly outweighs the evidence in support of the finding. *Gonzalez*, 195 S.W.3d at 681.

### b. *Factual sufficiency discussion*

Prior to signing the 2014 Will, Manuela met with Curtis to discuss the changes she wanted to make. About a week later, Manuela returned to sign the will. Rebecca drove Manuela to Curtis's office for both meetings, and Rebecca's cousin, Rose, accompanied them. There is no evidence, however, that Rebecca urged Manuela to change her will or to disinherit Rebecca's siblings. The direct evidence on the subject was to the contrary. Ray testified that Rebecca never pressured Manuela to sell her house or to change her will. Moreover, Curtis testified about the circumstances on the day Manuela signed the 2014 Will. Curtis asked Manuela what day it was, who the president was, and who was with Manuela and their names, all of which Manuela was able to answer correctly. According to Curtis, Manuela "acted like her regular self" at the meeting.[6] Curtis met with Manuela on prior occasions in connection with drafting the 2011 and 2013 wills. Manuela instructed Curtis that she wanted "to leave everything to Rebecca because Rebecca was the one taking care of her." Curtis spoke with Manuela primarily in English but also had her paralegal, Gina, discuss the will

---

[6] Similarly, Curtis testified that Manuela did not seem "any different than she always had" when signing the power of attorney that permitted Rebecca to sell Manuela's home.

14

with Manuela in Spanish. Manuela agreed to each section of the will. There is no evidence regarding who paid for Curtis's services. In addition to Rose, who was present at the signing, Rebecca told her brother Ray and her sister Delores about the 2014 Will but not any other family member.

It appears largely undisputed that after 2011 many of Rebecca's siblings did not visit Manuela regularly, if at all, which upset Manuela. Rose, Rosanna, and Ray all confirmed that Manuela complained about her children not visiting her: "She talked about that every other day, about the muchachas [girls] not coming, her children not coming." Ray said that Manuela was very upset in 2013 because her daughters would not visit her. Thus, multiple witnesses offered testimony supporting Manuela's justification for changing her will as stated to Curtis.

Importantly, the record contains no evidence that Rebecca habitually controlled Manuela during the relevant period. For example, Rebecca was Manuela's primary caregiver, but there is no evidence that Rebecca exercised control over Manuela in such a way as to overcome Manuela's desire to live her life as she pleased. Rose denied that Rebecca took control or put words in Manuela's mouth. Rose also denied that Rebecca was "secretive" or that she "pressur[ed] [Manuela] too hard to do things she didn't like." Allen said he was free to visit Manuela and that Rebecca did not listen in on his conversations with his grandmother. While a rift may have existed between Rebecca and Concepcion or other siblings that may have affected whether or how often Manuela's other children visited Rebecca's house, there is no evidence that Rebecca prevented contact between her siblings and Manuela. Additionally, though Rebecca had signatory authority on Manuela's bank account, we see no evidence that Rebecca restricted in any way Manuela's access to her account or that she asserted control over the account to Manuela's detriment. There is no evidence regarding the

15

account's balance or that Rebecca abused any position of trust or engaged in any bank account or other financial impropriety. To the contrary, Rebecca ensured that Manuela's social security check was directed to Manuela's account, and there is no proof Rebecca ever withdrew money from the account for any purpose not benefitting Manuela. Curtis prepared the 2014 power of attorney that ultimately allowed Rebecca to sell Manuela's home. Notably, the buyer was a company owned by Rebecca's daughter, but the record contains no evidence that the buyer paid less than fair value.

Rebecca disputes Concepcion's characterization of Manuela's mental capacity and contends that her mother was mentally sound and healthy for her age. In addition to Curtis's testimony that Manuela's mental condition appeared normal in 2014, Manuela's cardiologist testified that, in April and August 2014, he did not notice any neurological deficiencies: "[Manuela] was essentially oriented to date, space, time, and person, so there was no indication that she was not competent. And, you know, we indicated also that for her age, there was no obvious memory or judgment loss." The cardiologist was unaware, however, that Manuela had a stroke in 2012, and he did not disagree that a stroke will or can cause dementia. Nonetheless, he did not note a dramatic change in Manuela's mental condition until 2016, close to the time she passed.

One of Manuela's nieces, Rose, testified that she spent "two or three days a week" at Rebecca's house, helping to care for Manuela by bathing and feeding her. Rose testified that Manuela could tell her what she wanted, or did not want, to eat. Similarly, another niece, Rosanna, testified that if Manuela did not want to do something, like wear a seatbelt or eat yams, she simply would not do it. Rebecca testified that her mother could tell her no and that Manuela had a mind of her own.

16

Concepcion likens the facts of this case to *Yost v. Fails*, 534 S.W.3d 517 (Tex. App.—Houston [1st Dist.] 2017, no pet.), *overruled by Archer v. Anderson*, 556 S.W.3d 228 (Tex. 2018).[7]  In *Yost*, Sara McGowan was in her nineties and lived alone when a fall resulted in her hospitalization.  *Id.* at 520.  Afterward, she moved in with her nephew, James Fails.  *Id.*  McGowan granted Fails power of attorney, and he began managing her finances and using McGowan's money "to enrich himself."  *Id.*  McGowan also signed a new will naming Fails her primary beneficiary.  *Id.*  After McGowan died, McGowan's niece opposed Fails's application to probate the will, arguing that McGowan signed the will as a result of Fails's undue influence.  *Id.*  A jury found undue influence, and Fails appealed.  *Id.* at 521.

The appellate court affirmed.  There was no dispute that Fails had an opportunity to exert influence over his aunt by virtue of the living arrangements. *Id.* at 526.  Regarding whether Fails actually exerted influence, and that such influence overpowered McGowan's will, the court held that sufficient evidence supported the jury's verdict.  Specifically, the evidence showed that McGowan was totally dependent on Fails for all her basic needs while living in Fails's home.  *Id.* Fails assumed management of McGowan's finances and used a power of attorney to transfer hundreds of thousands of dollars from McGowan's accounts into Fails's own account.  *Id.*  There was also evidence that Fails placed McGowan's access to her finances "under lock and key" and that he "cussed" at her when she complained.  *Id.*  Further, Fails "steered McGowan" to an attorney to prepare the will, and the attorney's firm previously had represented Fails.  *Id.*  Fails supplied his own will as a template for McGowan's and drafted a handwritten list of bequests for McGowan's will.  *Id.*  Finally, there was evidence that the jury could

_____

[7] *Archer* overruled *Yost* to the extent that *Yost* held that Texas law recognizes a cause of action for intentional interference with inheritance.

17

have credited proving that Fails was in the room when McGowan signed the will. *Id.* In short, "considering the cumulative effect of the evidence concerning McGowan's susceptibility and dependence on Fails, Fails's misuse of McGowan's finances and the power of attorney, and the details surrounding the planning and preparation of the [challenged] will," the court held that reasonable jurors could find that Fails exerted his influence and subverted or overpowered the mind of McGowan at the time she signed the will. *Id.* at 527.

There exist more differences than similarities between *Yost* and the present matter. For example, Concepcion presented no evidence of financial impropriety by Rebecca. Concepcion emphasizes that Rebecca opened a bank account in Manuela's name in 2012, but, unlike in *Yost*, there is no evidence that Rebecca used her authority regarding the account to benefit herself or disadvantage Manuela. Rebecca did not transfer Manuela's money to her own accounts or prohibit Manuela from accessing her money. Rebecca also had Manuela's medical power of attorney and a general power of attorney, the latter of which Rebecca used to facilitate the sale of Manuela's house. But, as mentioned, there is no evidence that Manuela did not receive the proceeds of that sale, or that the value exchanged was unfair. Another key difference with *Yost* is the lack of evidence that Rebecca "steered" Manuela to attorney Curtis. Manuela previously employed Curtis's services to draft her 2011 and 2013 wills, along with powers-of-attorney, and initially contacted Curtis through Ray, not Rebecca. Curtis and Rebecca had no contact before Manuela retained Curtis's services. Given these significant differences from the circumstances in *Yost*, the facts that Manuela depended on Rebecca for daily care and that Rebecca discussed the 2014 Will with Manuela beforehand and was present at its signing are insufficient to support the undue influence finding. These facts do not establish an actual exertion of undue

18

influence over the 2014 Will that in fact subverted or overpowered the testator's mind, particularly when weighed against the contrary evidence. *See Rothermel*, 369 S.W.2d at 922-23; *Guthrie*, 934 S.W.2d at 832 ("While the fact that the executor 'took care of' the testatrix during her life may have influenced her decision to leave half her estate to him, we cannot characterize such influence as 'undue.'"); *In re Estate of Parrimore*, 2016 WL 750293, at *9.

The present facts are more analogous to several cases in which courts reversed undue influence findings on insufficiency grounds. In *In re Estate of Davis*, 920 S.W.2d 463 (Tex. App.—Amarillo 1996, writ denied), Ruby and Edgar Davis were a married couple and executed wills, devising the estate to the surviving spouse, or to their six children in equal shares if the spouse predeceased the testator. *Id.* at 464. Edgar became sick, and conflicts arose among various family members regarding his care and, ultimately, the funeral arrangements following his death. *Id.* at 464-65. Two of the couple's daughters lived with Ruby for a period after Edgar's death. *Id.* at 465. It was undisputed the daughters had "several conversations" with Ruby concerning the hurtful actions of two of their brothers "during the time of, and after, [Edgar's] illness." *Id.* Ruby changed her will, decreasing the share bequeathed to the two quarrelsome brothers and dividing the remainder equally among the other four children. *Id.* After Ruby died, the brothers contested the daughters' application to probate the new will, arguing undue influence. *Id.* The trial court found the daughters had exerted undue influence and denied probate. *Id.*

The appellate court reversed. The court agreed that the opportunity and environment existed in which the daughters could have exerted influence over Ruby. *Id.* at 466. But the court held that there was insufficient evidence that the daughters actually exerted influence: "Although the evidence does show the

19

daughters may have talked to Ruby about her wills, and they initiated conversations which may have emphasized and magnified the hurt she felt over the actions of [the sons], that evidence alone is insufficient." *Id.* In fact, Ruby's lawyer testified that Ruby explained her motivation for changing her will, and Ruby was alone during visits to the lawyer's office. *Id.* Thus, the court concluded that there was insufficient evidence to support a finding that the daughters actually exerted influence. *Id.*

Similarly here, the opportunity existed for Rebecca to speak with Manuela, both about Manuela's will and about the rift between Rebecca and some of the other family members, and Rebecca may have sought to curry favor with Manuela by telling her that Rebecca's siblings did not care because they did not visit regularly. But this evidence is insufficient to show undue influence, absent some direct or circumstantial evidence tending to show that Rebecca overbore Manuela's wishes regarding the disposition of Manuela's estate. *See id.* Although, unlike in *Davis*, Rebecca was present when Manuela executed the will, the totality of the evidence does not support a finding that Rebecca exerted an influence that overpowered or subverted Manuela's actual intent. *See Estate of Parrimore*, 2016 WL 750293, at *9 (presence at will execution is not evidence of undue influence).

Also persuasive is *In re Adkins*, No. 13-15-00066-CV, 2015 WL 13310094 (Tex. App.—Corpus Christi June 23, 2015, orig. proceeding) (mem. op.). Everett Tingle passed away at the age of eighty-seven. His caregiver and former son-in-law, Fred Adkins, sought to probate a will executed by Tingle in 2006, which essentially left Tingle's property to Adkins. Antonia Tingle, Tingle's ex-wife, sought to probate a will executed by Tingle in 2010, leaving his property to her. *Id.* at *1. A jury found that Tingle executed the 2010 will as a result of Antonia's undue influence, but the trial court granted a new trial after finding factually

20

insufficient evidence to support the jury's finding. *Id.* at *4. Adkins sought mandamus relief from that ruling, which the appellate court denied.

The court agreed that Antonia had ample opportunity to exert influence on Tingle regarding his testamentary intent. *Id.* at *24. Antonia and Tingle were married fifteen years before divorcing in 2003, but they remained friends and lived in the same apartment fourplex. *Id.* at *18. But the court found the evidence factually insufficient that Antonia actually exerted any influence on Tingle. Adkins testified that he thought Antonia had pressured Tingle into changing his will and that Adkins overheard Antonia telling Tingle that she thought Adkins was a bad person and "scum." *Id.* at *22. However, the evidence showed that Tingle acted independently in going to a bank and directing the bank's president to prepare the 2010 will pursuant to Tingle's specific testamentary intentions. *Id.* at *24. The record was devoid of any evidence regarding the "existence of a fraudulent motive on Antonia's part" or of Antonia's exertion of control over Tingle. *Id.* Thus, upon consideration of the entire record, the court concluded that the evidence regarding undue influence on Tingle amounted to a mere suspicion of wrongdoing and did not produce a reasonable belief that an influence was exerted that subverted or overpowered Tingle's mind and resulted in the 2010 will. *Id.* at *25.

*In re Estate of Montgomery*, 881 S.W.2d 750 (Tex. App.—Tyler 1994, writ denied), is similar as well. There, Stuart Montgomery executed a will leaving his estate to his wife, LaVonne, with the exception of real property going to his daughter, Dana. *Id.* at 752. Dana successfully contested LaVonne's application of the will to probate, arguing undue influence. *Id.* Dana presented evidence that LaVonne pursued a relationship with the recently widowed Montgomery and, after marrying, began influencing Montgomery's personal and social life, sometimes

21

contrary to Montgomery's preferences. *Id.* at 755. On appeal, the court held the jury's finding of undue influence was supported by legally sufficient evidence, but not factually sufficient evidence. There was no evidence that LaVonne discussed or expressed her desires as to the contents of the will, nor was LaVonne present when Montgomery signed it. *Id.* at 756. The drafting attorney testified that Montgomery "knew what he was doing and what he wanted to do with his estate." *Id.* In light of the entire record, the court concluded that the finding that the will was a product of undue influence was factually insufficient. *Id.* at 757.

As in *Adkins* and *Montgomery*, Concepcion's evidence raises nothing more than a suspicion of wrongdoing. *E.g.*, *Adkins*, 2015 WL 13310094, at *25. There is no evidence of a fraudulent motive or control by Rebecca, nor evidence that Rebecca expressed any personal desires regarding Manuela's will prior to execution. *See id.*; *Montgomery*, 881 S.W.2d 750. Most importantly, on the day she signed the 2014 Will, Manuela explained her motivation for changing her will directly to Curtis. *See Yost*, 534 S.W.3d at 526 ("When the relevant witnesses are available, their testimony about the planning and preparation of the challenged will is central to a claim of undue influence.") (citing *Boyer v. Pool*, 280 S.W.2d 564, 566 (1955)); *see also Adkins*, 2015 WL 13310094, at *24. Curtis testified that Manuela told her "that when [Manuela] passed, that Becky [Rebecca] had been the one taking care of her all this time, and Becky had -- it was effecting [sic] Becky financially, and that she wanted everything decided when she died so that the children would understand what she really wanted and it wouldn't be any problem." This rationale, stated directly to her counsel, constitutes a reasonable basis for Manuela's preference, and it is undisputed that Rebecca was Manuela's primary caregiver since 2011. *See Rothermel*, 369 S.W.2d at 923-24. Rose believed that Manuela "absolutely" knew what she was doing in September 2014.

22

*See Montgomery*, 881 S.W.2d at 756. Curtis's paralegal read the will to Manuela in Spanish, and Manuela agreed to each provision. And this was not the first time Manuela decided to change her will to disinherit some of her children. *Accord In re Estate of Kam*, 484 S.W.3d 642, 653 (Tex. App.—El Paso 2016, pet. denied) (disinheriting children does not in itself speak to undue influence).

Concepcion's reliance on evidence that Rebecca told Manuela that only Rebecca loved and cared for her presents nothing more than speculation that Rebecca might have overwhelmed Manuela's faculties by convincing Manuela to reward Rebecca for her love and care. *See id.*; *Adkins*, 2015 WL 13310094, at *22-24; *see also In re Estate of Davis*, 920 S.W.2d at 466.

Finally, Concepcion's evidence regarding Manuela's forgetfulness as early as 2011, and that she was diagnosed with dementia three months after signing the 2014 Will, is indicative only of a susceptibility to influence in September 2014. *See, e.g.*, *In re Estate of Kam*, 484 S.W.3d at 653. As explained, it does not show that Rebecca actually exerted influence over Manuela that overpowered Manuela's mind and desires.

After considering the entire record under the appropriate standard of review, we hold that the evidence of undue influence on Manuela regarding the 2014 Will amounts to a mere suspicion of wrongdoing and does not produce a reasonable belief that Rebecca exerted an influence that subverted or overpowered Manuela's mind and resulted in the 2014 Will.

Because there is insufficient evidence that the existence and actual exertion of influence upon the testator overpowered the testator's mind or desires, we need not substantively analyze the evidence pertaining to the third element. *E.g.*, *In re Estate of Sidransky*, 420 S.W.3d 90, 95 (Tex. App.—El Paso 2012, pet. denied) ("Evidence concerning one element is insufficient because each element is

23

necessary to establish a claim of undue influence.") (citing *Rothermel*, 369 S.W.2d at 923). We therefore conclude that the trial court's finding that Rebecca unduly influenced Manuela's expressed desire to change her will is contrary to the overwhelming weight of all the evidence and thus factually insufficient. We sustain Rebecca's second issue.

## Conclusion

We reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.

/s/ Kevin Jewell
   Justice


Panel consists of Justices Jewell, Bourliot, and Poissant.